[No. S004479. Crim. No. 22843. Dec. 27, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
BRONTE LAMONT WRIGHT, Defendant and Appellant.

COUNSEL

Robert Mann, under appointment by the Supreme Court, and Stephen Gilbert for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White and Richard B. Iglehart, Chief Assistant Attorneys General, Edward T. Fogel, Jr., Assistant Attorney General, Andrew D. Amerson, William R. Weisman, William T. Harter, Thomas L. Willhite, Jr., John R. Gorey and Susan D. Martynec, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**EAGLESON, J.**—Defendant Bronte Lamont Wright was convicted of the first degree murder of Patricia Hunter (Pen. Code, § 187),[1] rape (§ 261), attempted robbery (§§ 664/211), and burglary (§ 459). Various enhancement allegations were found true: personal use of a deadly and dangerous weapon, infliction of great bodily injury upon a victim of advanced age, and commission of the offenses while defendant was on parole following a term of imprisonment for a violent felony in which he had used a handgun. (§§ 1203.075, 1203.085, 1203.09, 12022.7, 12022.8, 12022.) Three special circumstances were found true: that the murder was committed while defendant was engaged in the commission or attempted commission of a robbery (§ 190.2, subd. (a)(17)(i)), rape (§ 190.2, subd. (a)(17)(iii)), and burglary (§ 190.2, subd. (a)(17)(vii)). The jury fixed the penalty at death; this appeal is automatic. (§ 1239, subd. (b).)

We filed an initial opinion in this case on March 2, 1989, affirming the judgment of guilt and reversing the penalty. Thereafter we granted a

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

rehearing; supplemental briefs have been filed raising several new claims with citation to recent authorities. For the reasons set forth hereafter, we now conclude that the judgment should be affirmed in its entirety.

FACTS

*Guilt Phase*

Mrs. Patricia Hunter, a 76-year-old widow, was last seen alive by a schoolgirl as she sat on the porch of her Pasadena residence at approximately 4:30 p.m. on April 30, 1981. Assistant Pastor Frank Brown became concerned the following day when Mrs. Hunter failed to attend a Sunday school teachers' meeting. He went to her house but received no response to his knock on the front door or his taps on the side of the house. He crossed the street and enlisted the assistance of another church member, Ms. Hetker. The two returned to Mrs. Hunter's home and entered through the unlocked front door. They discovered Mrs. Hunter's half-clothed body on the living room floor, returned to Hetker's residence and summoned the police.

Pasadena police officers found the victim naked from the waist down with socks, slacks, pantyhose, and underwear draped over the lower portion of the body. Blood was found splattered around the room and the upper portion of the telephone receiver was covered in blood. Broken bric-a-brac was strewn around the room indicating the victim had struggled with her assailant. A pillow was found next to the victim's head.

A deputy medical examiner determined the victim had died from massive brain damage due to "many, many blows" delivered to "all areas of the head." He testified the injuries were so extensive that "[t]he scalp was lifted away from the skull for a distance of about one inch by what amounted to a lake of liquid blood . . . ." Marks and discoloration around the victim's eyes were consistent with being struck with the telephone receiver. Defensive wounds and abrasions were found on her hands and wrists. In addition, there was evidence of strangulation. Further investigation revealed the presence of sperm in the external vaginal area but none inside the vagina. Physical evidence of penetration was inconclusive.

A police fingerprint expert examined the crime scene and found defendant's palm prints on a copy of Guidepost magazine and on a newspaper which were recovered from the living room next to where the body was found. Two neighbors reported having seen defendant, who lived within a block of the victim's residence, walk by the victim's house between 3 and 4:30 in the afternoon on April 30. Ten to thirty minutes later, the same

neighbors saw defendant return, stop in front of the victim's home, and stand there looking at the victim's property for one and one-half to two minutes.

Pasadena police obtained a warrant and arrested defendant, with the assistance of his parole officer, one week after the murder. He was interviewed the following day. Defendant initially denied any involvement, but thereafter confessed to the crimes. The interview session was tape-recorded. Defendant stated he went to the victim's house and asked if he could mow her lawn. When she replied she already had somebody who performed that job for her, he asked for a glass of water. When she brought the glass to the door, he forced his way in. She began screaming so he hit her. He admitted striking her many times but claimed he left her alive, although he stated she was having difficulty breathing. He confessed to attempting to rape the victim, was equivocal as to whether he had achieved penetration, but admitted having ejaculated. He further admitted that he entered the victim's home because he believed she would be an "easy mark," and that he took $5 and some change from the victim. He admitted "murdering" the victim but claimed it was not "intentional."

Defendant did not testify and introduced no evidence at the guilt phase.

*Penalty Phase*

At the penalty phase, the prosecution presented extensive evidence documenting defendant's criminal history. On December 18, 1972, defendant, then 18 years old, along with a juvenile accomplice, entered the home of 80-year-old Shiu Maruyama and ransacked the residence looking for money. The accomplice held the victim at defendant's direction but had to constantly remind defendant not to harm her. They tried to force a ring from the victim's finger but were unsuccessful. Defendant was apprehended at the scene and confessed his involvement in the crime to one Agent Cauchon. Cauchon testified at the penalty phase that defendant smiled while describing the incident to him and did not appear to exhibit any remorse whatsoever. Defendant was eventually convicted of second degree burglary.

On June 21, 1974, defendant robbed two different victims in a Pasadena bank parking lot. The first, Jennifer Salsbury, testified defendant approached her as she was getting into her car, exhibited a gun, and took her wallet. Salsbury drove away when defendant told her she would not be harmed if she left the scene. Minutes after the Salsbury robbery, defendant robbed Muriel Cunningham in the same parking lot. After exhibiting his gun, defendant took the victim's purse containing between $50 and $60 and

fled on foot. Although both victims later testified in court against defendant, there is no indication that convictions were obtained.

On March 20, 1977, defendant, armed with a shotgun, robbed Stephen Hardin, who was working as a desk clerk in a Glendale motel. After pointing the shotgun at his victim and threatening to kill him if he did not do as ordered, defendant obtained between $200 and $300 from the till, then forced Hardin to remove his trousers and stay in a closet until defendant made good his escape. Once again, although Hardin testified against defendant, there is no indication in the record that a conviction was obtained.

Four days later, defendant entered a 7-Eleven convenience store in Glendale wearing a ski mask and brandishing a revolver. He instructed Tracie George, the clerk, to give him all the money in the register and she complied. Ronald Pure, George's boyfriend, was also present and was ordered by defendant to lie on the floor. Defendant was apprehended when Glendale Police Officer Tuosto observed him fleeing from the scene. Tuosto found defendant in possession of the stolen money, a revolver, and a ski mask. The handgun was fully loaded and operational; a bullet was in the chamber and an indentation in the shell casing evidenced that the firing pin had struck it but that the round had misfired. Defendant was convicted of first degree robbery with use of a handgun and assault with intent to commit robbery.

On June 25, 1977, Deputy Sheriff Molina observed defendant and inmate-victim Shires together in a locked cell in county jail. Shires was bleeding from two slashes on his abdomen. A search revealed a razor blade secreted in the cell's toilet. Defendant was later convicted of assault with a deadly weapon.

In addition to the incidents related above, the trial court took judicial notice of court documents establishing that defendant had been convicted in 1974 of two robberies involving the use of a handgun against victims Darland Shaw and Lena Johnson.

The prosecution also presented considerable evidence regarding defendant's behavioral and adjustment problems while in prison. Correctional Officer Ortiz testified that on October 30, 1977, he observed defendant straddling and punching an inmate named Martin, who was spitting out blood. After correctional officers broke up the altercation, defendant jumped back into the fray, striking Martin two more times. The writeup of the incident concluded Martin had provoked the fight but that defendant struck the first blows.

Gregory Avila testified that he was a counselor at the California Men's Colony and that on May 16, 1978, he interviewed defendant to determine

whether he wished to participate in any educational or vocational training. Defendant replied he did not want to go to school. When queried how he planned to make a living after leaving prison, defendant replied that if he saw something he wanted, he would just take it. Defendant expressly stated he had no intention of altering his criminal conduct.

On August 10, 1978, defendant was overheard threatening Correctional Officer J.R. Duran that Duran's "body" would be the next one found in the recreation shack. An inmate's dead body had been discovered in the shack just 15 minutes earlier. Teri Gelatini, a kitchen worker at San Quentin, testified and recounted a 1979 incident in which defendant became verbally abusive towards her, allegedly threw a piece of paper at her, and needed to be restrained by guards. The writeup of this incident showed defendant admitted making unbecoming remarks towards Gelatini but was falsely accused of throwing the paper at her. He admitted he became upset with her because she had previously been "tolerant" of him, but had subsequently changed.

In late 1978, defendant approached Corrections Sergeant Ochoa and demanded a transfer out of his quad, saying he would hurt somebody unless he was transferred. A similar threat occurred in late 1979 when defendant told Correctional Counselor Bauer that someone would die if he was transferred to a different unit. On November 6, 1979, defendant was interviewed by Program Administrator Nyberg concerning the administrative decision to place defendant in restricted housing. Defendant became verbally. abusive, upset the conference table, threw a chair against the wall, and was restrained by Nyberg. No one was injured during the incident.

On June 19, 1979, Correctional Counselor John Williams interviewed defendant in San Quentin Prison. Defendant said that he was going to kill several women and one man when he was released from prison. He further stated he would make headlines and would not be captured by police. Williams reported defendant was a "sick," "dangerous" prisoner and warned staff to use caution when seeing him. Similarly, Correctional Counselor Crook testified that on December 4, 1980, he interviewed defendant about his postrelease plans and defendant replied, "I am freaky on the streets" and "I like to do all sorts of freaky things with the ladies."

The penalty phase evidence introduced by the defense consisted of testimony by defendant's mother and uncle, as well as psychological evidence establishing defendant's low intelligence. Defendant's mother, Brooksie Wilson, testified that defendant's father was physically abusive to both her and defendant. The father beat defendant, striking him in the head on several occasions, and would lock the children in a closet when Wilson was

away at night school. Wilson recalled one incident in which defendant's father had struck him on the head with a brick.

As a result of the beatings, Wilson moved with her children to California when defendant was two years old. Wilson remarried, but her second husband was an alcoholic and was jealous of the attention Wilson showed towards defendant. He often demanded to know whether Wilson loved him more than defendant. On numerous occasions Wilson's second husband would refuse to allow defendant into the house, or would order him to sleep on a mattress in the backyard. Defendant fought constantly with his stepfather, on one occasion getting into a fight with him after the stepfather physically abused defendant's mother. On another occasion defendant's natural father and his stepfather had a confrontation which resulted in both drawing guns, which incident was witnessed by defendant.

In school, defendant was diagnosed as having a learning problem. His attention span was very short. He was always placed in special classes and routinely received failing grades. In high school, he only attended school for two or three hours a day and spent the remainder of the day playing on the school grounds. Wilson estimated defendant's "mentality" was that of a 13-year-old. She described him as "very immature" but protective of her, saying he became very upset when anyone directed a derogatory remark at her. He knew she was struggling to make a success of her life and he would clean people's houses or yards and bring her half the money.

Wilson tried to obtain help for her son but was unsuccessful. Her appeal to the Director of the California Youth Authority was fruitless. She characterized defendant's stay in the California Youth Authority as merely a custodial situation, and felt no real attempt was made to rehabilitate him. She believed he received virtually no supervision while on parole.

On cross-examination, Wilson testified that on one occasion she had an argument with defendant about mailing obscene letters to women in their neighborhood, and had told him to stop doing it. She further testified she did not believe defendant had a violent or explosive temper, nor did she consider him a dangerous individual. Defendant was living with Wilson and the stepfather, one-half block away from Hunter's residence, on the date of her murder.

John Williams, defendant's uncle, had known defendant since he was two years old. Williams described defendant as a good worker who obeyed orders. However, he related an incident when, upon being chastised, defendant began rubbing his hands together in a frenzy, repeating, "I don't know" over and over again. Williams said defendant became anxious when

someone raised his voice. He also recalled defendant as a compulsive eater; on occasion defendant would spend his entire earnings, from doing odd jobs, on six or seven hamburgers, which he would eat in front of his friends without offering to share the food. Williams and his wife believed defendant may have been in need of psychiatric help, but they did not want to get involved in the matter.

Dr. Robert Van Vorast, a clinical psychologist who worked for the California Youth Authority, treated defendant between 1974 and 1976. Van Vorast concluded defendant was impulsive, but not psychotic. Defendant's intelligence was in the "borderline" to "low dull normal" range, meaning fourth or fifth grade level or slightly higher. "Continual intensive supervision" and regular therapeutic help was necessary for defendant to function in the community.

Dr. Michael Maloney, a clinical psychologist, also examined defendant. When asked whether he had found any evidence that defendant suffered from brain damage, he acknowledged there was no medical evidence of any brain damage in defendant's history, but explained: "As a psychologist, what we really look for [are] certain patterns of behavior and certain deficits in certain areas. [¶] From that point of view, Mr. Wright clearly has deficits in certain perception areas, perceptual motor areas. [¶] I don't know that there have been any hard clinical findings, medical findings to suggest brain damage, but he has a pattern that looks like that from a psychological point of view, and it has been commented on back in to teenage years when he was at the California Youth Authority."

After discussing the results of some tests he had defendant take, Dr. Maloney continued: "Oftentimes [test results such as defendant's are] . . . suggestive of some disorganization in the brain and I might add that a person certainly could fake this, but Mr. Wright has had references made to this kind of difficulty for years, much predating his arrest in this case. [¶] So he does have a problem in this area, and as I said, it's often suggestive of organic brain disfunction [sic] and certainly not diagnostic of it. [¶] It does not mean that he has it, but there is something that is disfunctional [sic] in that area."

When asked on direct examination, "Did you make any judgments as to whether or not [defendant is] psychotic?," Dr. Maloney replied: "I saw no evidence that he is psychotic. [¶] He does give some pretty peculiar and even bizarre responses at times, but in terms of basic thinking processes, they're not overly disturbed. [¶] He didn't hallucinate, as far as I know of. [¶] He's not delusional. [¶] So the hard basis for a diagnosis of psychosis he doesn't have."

Finally, Dr. Maloney agreed with Van Vorast's test results reflecting defendant's low level of intelligence.

After considering this penalty phase evidence, the jury set the penalty at death. Motions for modification of the penalty verdict, and for a new trial, were denied.

## DISCUSSION

### I. *Guilt Phase*

#### 1. *Speedy Trial*

Defendant first contends that his conviction must be reversed due to a violation of his statutory right to a speedy trial. Former section 1382 (applicable here) provided, in pertinent part: "[t]he court, unless good cause to the contrary is shown, must order the action to be dismissed in the following cases: . . . [¶] 2. When a defendant is not brought to trial in a superior court within 60 days after the . . . filing of the information . . . ."

■ A continuance granted at the request of counsel normally constitutes such good cause (*People* v. *Kirkpatrick* (1972) 7 Cal.3d 480, 486 [102 Cal.Rptr. 744, 498 P.2d 992]), at least in the absence of evidence showing incompetency of counsel (*Townsend* v. *Superior Court* (1975) 15 Cal.3d 774, 781 [126 Cal.Rptr. 251, 543 P.2d 619]) or circumstances where counsel's request for a continuance is prompted only by the need to service other clients and the defendant himself objects to the delay. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 566-569 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) ■ Moreover, a defendant's failure to timely object to the delay and thereafter move for dismissal of the charges is normally deemed a waiver of his right to a speedy trial. (*Sykes* v. *Superior Court* (1973) 9 Cal.3d 83, 94 [106 Cal.Rptr. 786, 507 P.2d 90]; *People* v. *Wilson* (1963) 60 Cal.2d 139, 146 [32 Cal.Rptr. 44, 383 P.2d 452].)

Defendant was arraigned on July 10, 1981, and went to trial on August 13, 1982. During the interim, several continuances were granted at defense counsel's request. On at least one occasion, defendant personally waived time. There was no pretrial objection by either defendant or defense counsel on speedy trial grounds.

Defendant acknowledges he failed to register a timely objection, but he argues his waiver was not a knowing and intelligent one because his defense attorney and the trial judge collaborated to prevent him from learning why counsel sought the several continuances. He claims the trial judge

misinformed him regarding defense counsel's legal experience, thereby lulling him into the belief that counsel would preserve his rights. Defendant's citation to the record, however, shows only that the trial court told defendant his appointed counsel was "an excellent attorney . . . very effective . . . very thorough . . . [and] conscientious." It does not appear the trial court misled defendant by this comment.

Defendant also complains he was denied an opportunity to participate in the proceedings and was thus uninformed as to the reasons for the various continuances. This claim stems from a bench meeting between counsel, the prosecutor, and the judge, out of defendant's hearing. ■ ■■ ■■ At this meeting, counsel admitted that this was his first murder trial involving special circumstances, and that one reason for the requested continuance was to allow him time to attend a public defender's seminar on how to try such cases.[2] In addition, other reasons (his own workload and his investigator's vacation) were discussed.

We assume defendant is arguing that had he known this was counsel's first murder trial involving special circumstances, he would have personally objected to a further continuance. This is illogical. While counsel's relative inexperience may have prompted defendant to move for appointment of new counsel or to proceed without an attorney, it would not have led defendant to refuse to waive time, which would only have resulted in his attorney having to go to trial less prepared.

Defendant also points to defense counsel's statement at the bench that a conference out of defendant's earshot was necessary "because of problems of client control." This statement, defendant claims, is indicative of counsel's belief that what would be said—namely, that this was counsel's first special-circumstances murder trial—would prompt defendant to refuse to waive time. Although the "client control" remark may well have reflected counsel's belief that his anticipated comments would further provoke defendant, as stated above we doubt they would have prompted defendant to refuse to waive time.

---

[2] In a related claim, defendant contends this bench conference denied him his due process right to be present at a critical phase of the proceedings. However, "the accused is not entitled to be personally present . . . at bench discussions which occur outside the jury's presence on questions of law or other matters in which the defendant's presence does not bear a ' "reasonably substantial relation to the fullness of his opportunity to defend against the charge." ' " (*People* v. *Jackson* (1980) 28 Cal.3d 264, 309 [168 Cal.Rptr. 603, 618 P.2d 149], quoting *In re Lessard* (1965) 62 Cal.2d 497, 506 [42 Cal.Rptr. 583, 399 P.2d 39].) Moreover, the "burden is upon defendant to demonstrate that his absence prejudiced his case or denied him a fair and impartial trial. (*Jackson, supra,* at p. 310.) Defendant has not met that burden here. Moreover, although he argues he might have refused to waive time had he been privy to the discussions at bench, such is pure speculation, contradicted by his willingness to waive time as evidenced in other parts of the record.

In the absence of anything in the record to support defendant's claim that his own attorney and the trial court collaborated to prevent him from personally objecting to continuances, his failure to timely object and move for dismissal must be deemed a valid waiver precluding appellate review. (*Wilson, supra,* 60 Cal.2d at p. 146.)

### 2. *Arrest Warrant*

Prior to trial, defendant sought to suppress his confession to police on grounds that the arrest warrant was not supported by probable cause. At the section 1538.5 hearing, the parties discovered that the original affidavit in support of the arrest warrant had been destroyed by the superior court clerk's office in accordance with their internal policy. Defendant promptly objected to the introduction of secondary evidence to establish the contents of the missing affidavit, citing the best evidence rule. (Evid. Code, § 1500.)[3]

The trial court reserved judgment on the objection and permitted the People to question the police officers involved in the procurement of the arrest warrant. Sergeant Gray testified that he prepared the affidavit in support of the arrest warrant, and that it consisted of photocopies of all police reports up through the date of submission of the package to the magistrate, Judge Franciscus. The prosecutor, who had obtained a new copy of the applicable police reports in the meantime, showed the new copy to Sergeant Gray and asked, "So the information that you presented to Judge Franciscus is everything that is visible and legible on these pages; is that correct?" Gray responded: "Yes, to the best of my recollection, that is the complete document that I gave Judge Franciscus." Joseph Downs, a police fingerprint expert, testified he matched the palm prints found at the scene to exemplars of defendant's palm prints. His findings were included in the police reports which Sergeant Gray testified were submitted to the magistrate.

The trial court overruled the objection, in effect permitting proof of the contents of the original writing by secondary evidence pursuant to Evidence Code section 1501, which provides that, "A copy of a writing is not made inadmissible by the best evidence rule if the writing is lost or destroyed without fraudulent intent on the part of the proponent of the evidence."

Defendant contends that the admission of such secondary evidence was error. He argues that there was no competent evidence introduced to establish that the original writing was lost or destroyed. He argues further that

---

[3] Evidence Code section 1500 states: "Except as otherwise provided by statute, no evidence other than the original of a writing is admissible to prove the content of a writing. This section shall be known and may be cited as the best evidence rule."

the trial court erred in concluding that the reconstructed affidavit was identical to the original affidavit since the cover sheet of the orginal affidavit, which was available, reflected that the original affidavit-package was 45 pages in length, whereas the People's reconstructed copy consisted of 59 pages.

Defendant's claims are unavailing for several reasons. First, because defendant was arrested in an automobile on a public street, and not inside a residence, a warrant was not required in the first instance (*Payton* v. *New York* (1980) 445 U.S. 573, 576 [63 L.Ed.2d 639, 644-645, 100 S.Ct. 1371]; *People* v. *Ramey* (1976) 16 Cal.3d 263, 275-276 [127 Cal.Rptr. 629, 545 P.2d 1333])—as long as the arresting officers had probable cause to believe defendant committed the murder of Patricia Hunter. (§ 836.) ■ When the arresting officer has probable cause to arrest for a felony, and the arrest is not made inside a residence, the arrest is valid even though made under an invalid arrest warrant. (*United States* v. *Rose* (8th Cir. 1976) 541 F.2d 750, 756; *People* v. *Kirk* (1974) 43 Cal.App.3d 921, 926 [117 Cal.Rptr. 345]; see *People* v. *Groves* (1969) 71 Cal.2d 1196, 1199 [80 Cal.Rptr. 745, 458 P.2d 985].)

At the suppression hearing, Officer Gray testified that in making the arrest he knew that defendant lived near the victim, that defendant had been seen near the victim's residence shortly before her death, and that defendant's palm print was found on two articles in the same room where the victim's body was discovered. These facts amply support the trial court's determination of probable cause to arrest. Although the prosecution is generally not permitted to assert a new legal theory on appeal (see *People* v. *Hamilton* (1969) 71 Cal.2d 176, 182 [77 Cal.Rptr. 785, 454 P.2d 681]), in this instance the issue of probable cause was fully litigated in the trial court, and the defense could not have been prejudiced by the prosecution's failure to expressly rely on a theory that the arrest was lawful regardless of the warrant's validity.

■ In any event, on this record we conclude that defense counsel's best evidence rule objection was properly overruled, and the suppression motion properly denied. At the hearing on the motion, defense counsel made certain statements that the trial court could reasonably have interpreted as an assent or agreement that the original documents in support of the arrest warrant had been destroyed. Counsel stated: "*I think it is established what the problem is* and right here and now I am going to make that objection . . . . There is insufficient probable cause *because the original record has been thrown away.* . . . I would object to introduction of secondary evidence under the circumstances." (Italics added.)

By acknowledging that the documents had been "thrown away" and that the nature of the problem was "established," defense counsel gave his assent to the factual representation made by the court that the original documents had been destroyed by the clerk. This affirmative manifestation of assent made it unnecessary to introduce evidence of those facts and precludes defendant from arguing on appeal that the facts were not proved by competent evidence.

The record further reflects that the critical police reports concerning the palm print evidence, the sightings in the neighborhood, and that a murder had occurred, are all dated prior to May 8, the day the arrest warrant was obtained. Given Sergeant Gray's testimony that he would not have sought the arrest warrant without the palm print evidence, we may infer that, even if the original affidavit-package consisted of only 45 pages, included therein was evidence of the palm print, the neighborhood sightings of defendant, and that the victim's death was the result of a murder. Thus, even assuming Sergeant Gray's testimony was subject to impeachment with the page discrepancy, the failure to object was clearly harmless.

3. *Random Jury Selection*

Defendant next challenges the method by which the trial judge selected the initial group of 21 prospective jurors to be voir dired from among the 84 venire persons. Apparently concerned that the traditional method of narrowing the group of venire persons for voir dire—i.e., a random draw of 12 names from a trial jury box—would inconvenience the 84 venire persons since the courtroom could only seat 48 people, the trial judge decided to designate the first 21 venire persons who came through the courtroom door as the first group.

Defense counsel objected to this procedure, claiming it violated his right to a randomly selected jury. Specifically, counsel argued that cliques of venire persons might enter the courtroom together, resulting in all or no persons of any such group being included amongst the first 21 people to enter the courtroom. In addition, counsel speculated that a venire person with an aggressive personality might "self-select" himself by entering first due to his eagerness to serve. Finally, after the first 21 prospective jurors were seated, counsel noted (out of the jury's hearing) that no Blacks were in that group, and that several Black venire persons were seated together in the back of the room. The trial court indicated its belief that the chosen method of selecting prospective jurors was no less random than if the names were to be drawn from the box in the traditional manner, and overruled the defense objection.

The prosecutor suggested an alternative procedure which would have addressed the logistical problems of the small courtroom while perhaps

better ensuring a random draw. The trial judge admitted the "solution is a good one, but I don't think it's necessary," and commenced to implement the first-come, first-served procedure. Later, the prosecutor expressed his misgivings, telling the judge he believed the Penal Code required a random draw of names from the trial jury box. By that time several prospective jurors had been voir dired, and defense counsel had noted his objection to any "irregular procedures." After reviewing the Penal Code, the trial judge concluded that the relevant provisions did not direct a specific method of picking jurors, and overruled all the objections.

Defendant now argues that the trial court's actions abrogated his right to a randomly selected jury. We conclude, however, that although the jury selection procedure utilized below was unorthodox, reversible error is not shown.

"Trial juries for criminal actions are formed in the same manner as trial juries in civil actions." (§ 1046.) Once the panel of prospective jurors is drawn "in a manner to insure random selection" (former Code Civ. Proc., § 246), the panel is sent to the trial court in order to select a jury therefrom. Former Code of Civil Procedure section 600 (which applies here) provided the applicable procedure: the clerk "must draw from the trial jury box of the court the ballots containing the names of the jurors, until the jury is completed, or the ballots are exhausted."

Of course, "a party is constitutionally entitled to a petit jury that is as near an approximation of the ideal cross-section of the community as the process of random draw permits." (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 277 [148 Cal.Rptr. 890, 583 P.2d 748].) However, failure to comply with the procedures set forth in former Code of Civil Procedure section 600 does not automatically require reversal. "A challenge to the panel can be founded only on a *material departure* from the forms prescribed in respect to the drawing and return of the jury in civil actions . . . ." (Former § 1059, italics added.)

Defendant relies on *People* v. *Johnson* (1894) 104 Cal. 418 [38 P. 91], in which case the jurors, as here, were not selected by a random draw of names from the the trial jury box. In that case *the bailiff* selected 12 prospective jurors from among the venire persons present in the courtroom, and those 12 persons ultimately served on the jury without objection from defense counsel. Although this court held that the failure to object waived any claim of error, we noted that "[t]his mode of impaneling a jury differs materially from that prescribed in the statutes of the state, and if it had been done against the objection of defendant it would have constituted sufficient reason for reversal." (*Id.* at p. 419.)

Defendant urges that the instant case contains an error "virtually identical" to that in *Johnson, supra,* 104 Cal. 418. We disagree. Since the bailiff in *Johnson* personally chose the jury from among the venire persons, the draw was not random, but was instead subject to the biases, both conscious and unconscious, of the person making the selections. In contrast, the selection procedure utilized here was not controlled by any one individual. We are unpersuaded that *Johnson* is controlling on these facts.

What must be determined is whether the selection procedure employed here constitutes a "material departure" from that set forth in former Code of Civil Procedure section 600. We conclude that it does not. While the scenarios postulated by defense counsel in support of his objection to the procedure raise some legitimate concerns, the record reflects that several panels of venire persons were ultimately utilized for selection of the jury in this case. Moreover, to the extent the procedure had the potential to manifest some subtle bias, that potential was de minimis since, after the first 21 venire persons were questioned, selection of jurors from all the remaining venire persons was accomplished by the traditional method. Significantly, unlike the case in *Johnson, supra,* 104 Cal. 418, selection of the initial group of 21 prospective jurors was not undertaken by a single person, and there is no evidence that persons in that group were aware that the order in which they entered the courtroom would determine whether they would be included in the initial group to be voir dired. Moreover, the record shows defense counsel was able to fully question the venire persons and exercise his peremptory challenges in an informed manner.

Although we do not endorse the jury selection procedure employed here, we conclude that, on these facts, there was no material departure from the statutory procedure such as would require sustaining a challenge to the composition of defendant's jury.

### 4. *Peremptory Challenges*

#### a. *Use of the "Struck Jury" Method to Pick Jurors*

After voir dire of the initial group of 21 prospective jurors was completed, but prior to the exercise of the first peremptory challenge, defense counsel objected to the "irregular picking of the jury" and requested that no more than 12 persons be present in the jury box at any one time, arguing the juror selection procedure employed by the court thus far was not permitted by the Penal Code. The court noted the objection and impliedly overruled it, stating, "Well, the Penal Code doesn't specify, Mr. Blum. It allows for a little creative judging and that's what we're doing here."

Each side then exercised 5 peremptory challenges against the initial 21-person panel, and the court had the clerk pick an additional 10 names at random. After 9 further peremptory challenges were exercised (leaving a jury of 12), another 6 prospective jurors were picked at random. The exercise of additional peremptory challenges left the panel at 11 jurors. The court then stated it would "do this one more time," but after a renewed objection by defense counsel was overruled, counsel withdrew his last peremptory challenge, leaving 12 seated jurors. However, the prosecutor then challenged 1 juror and 5 more names were drawn. After 3 more challenges, the prosecutor accepted the jury of 13. The trial court then indicated that if both sides passed on a jury of 13, 1 juror would be eliminated by a random draw. Instead, defense counsel challenged a final juror, leaving 12, and both sides then accepted the jury.

■ Defendant contends the trial court's decision to have him direct his peremptory challenges against a potential jury of more than 12 persons improperly diluted his right to exercise his peremptory challenges.

■ Former section 1088 (which applies here) stated, in pertinent part, that "each party shall be entitled to have the panel full before exercising any peremptory challenge." Although past cases involved the failure to maintain a full complement of 12 jurors when the parties were exercising their peremptory challenges (see, e.g., *People* v. *Scoggins* (1869) 37 Cal. 676; *People* v. *Dufur* (1917) 34 Cal.App. 644 [168 P. 590] [both cases having been decided before the enactment of the language in former section 1088 requiring a "full panel"]), the question of whether former section 1088 is violated when *more* than 12 persons are in the jury box appears to be one of first impression.

A recent federal case cogently explains the different methods for exercising peremptory challenges posed here. "In the 'jury box' system of jury selection, the parties exercise their challenges against jurors already seated in the box, and who will remain on the jury unless challenged." (*United States* v. *Ricks* (4th Cir. 1986) 802 F.2d 731, 733.) This is the system utilized in California. However, "the 'struck jury' method of jury selection [is] where the trial judge tenders to each party a list of qualified veniremen and each side exercises its peremptories against the names on the list. If, after each side exercises its strikes, there remains more than 12 persons on the list, the trial judge must decide which twelve will constitute the jury." (*Ibid.*, fn. omitted.) The trial judge apparently attempted to employ a variation of the "struck jury" method in this case.

■ Defendant argues that strategic use of a peremptory challenge against any 1 prospective juror requires knowledge of the personalities of

the remaining 11 jurors in the jury box. In seeking to obtain a balance of personalities on the jury, seasoned counsel's acceptance of 1 juror might be influenced by the presence of another juror or jurors on the panel. Requiring defendant to exercise his challenges against a panel of 21 prospective jurors in theory might have made it more difficult for counsel to evaluate the suitability of any particular juror, since counsel could not be certain who the other 11 jurors would be. Finally, under the "struck jury" method, if both sides passed on a panel consisting of more than 12 jurors, actual service of any 1 juror would then depend on the further luck of the draw.

However, many of these same concerns were faced in the cases involving less than a full panel. For example, in *Scoggins, supra,* 37 Cal. 676, the trial court had the clerk choose one juror at a time and insisted both sides decide whether that juror was acceptable before moving on to the next one. Describing the procedure then applicable, we noted the trial court should have randomly drawn 12 names and had all 12 jurors sit in the jury box for voir dire and the exercise of peremptory challenges. We observed that "[t]he theory of the law probably is that the right to challenge peremptorily cannot be exercised so judiciously until the panel is *filled* with competent and qualified jurors, of whom each party is allowed to reject a certain number without assigning any reason therefor." (*Id.* at p. 680, italics added.) We thus recognized early on that the composition of the entire panel can be relevant to the exercise of a peremptory challenge against any one juror.

In *In re Mendes* (1979) 23 Cal.3d 847 [153 Cal.Rptr. 831, 592 P.2d 318], 12 jurors were chosen, but before the alternate could be selected, 1 of the 12 was discharged due to a death in the family. The defendants challenged the trial court's decision to reopen jury selection and permit the exercise of any unused peremptory challenges against the remaining 11 jurors. In affirming the judgment in that case, we observed that "there was a valid reason for the court to allow peremptory challenges [against the 11 jurors already chosen:] so that both sides could satisfy themselves to the best of their ability with the final composition of the jury." (*Id.* at p. 855.) We quoted, with apparent approval, the trial court's comments in support of its ruling: " 'There is a possibility that somebody might have in the back of their mind that the new juror wouldn't fit in with the total panel.' " (*Ibid.*)

It is clear that knowledge of the composition of the entire panel can be relevant to the informed exercise of a peremptory challenge against a particular juror. (But see *United States* v. *Blouin* (2d Cir. 1981) 666 F.2d 796, 798-799 [suggesting that the "struck jury" system may be more advantageous from a strategic point of view].) However, the fact that the procedure utilized here may have stood to make the exercise of the initial peremptory challenges less informed, does not in itself require reversal. This is not a

case where the defendant was prohibited from exercising all of his allotted peremptory challenges, which error would require reversal. (See *People* v. *Armendariz* (1984) 37 Cal.3d 573, 584 [209 Cal.Rptr. 664, 693 P.2d 243].) Although the jury selection procedure utilized here may have carried the *potential* for prejudice, we are not persuaded that such potential was realized here.

The initial panel of 21 prospective jurors was pared down to the final 12 actual jurors via the challenge process, under procedures equally applicable to both sides. As the voir dire session drew to a close, both defense counsel and the prosecutor knew which 12 jurors would in probability comprise the petit jury. Although defendant hypothesizes that under the trial court's chosen procedure a defendant might logically be forced to exercise all of his peremptory challenges against a group of "50 or 100 or 5000" panelists, that simply did not occur here.

We caution that adherence to the Legislature's statutorily prescribed jury selection procedures remains the proper and authorized way to ensure selection of a fair and impartial jury. Although the jury selection method utilized here departed from the statutory procedures then in effect, it did not unduly prevent defendant from exercising any of his allotted challenges, or otherwise fundamentally flaw the selection or final composition of defendant's petit jury. Under such circumstances, it is settled that relief will not be granted on appeal absent a showing of prejudice. (*People* v. *Mitchell* (1964) 61 Cal.2d 353 [38 Cal.Rptr. 726, 392 P.2d 526]; *People* v. *Hoyt* (1942) 20 Cal.2d 306 [125 P.2d 29]; *People* v. *Saugstad* (1962) 203 Cal.App.2d 536 [21 Cal.Rptr. 740].) Although requiring defendant to exercise his peremptory challenges against a panel of more than 12 prospective jurors at any given time technically ran afoul of the statutorily prescribed jury selection procedure, prejudice warranting reversal has not been demonstrated.

b. *Purposeful Discrimination Under Batson v. Kentucky*

During voir dire, the prosecutor exercised a peremptory challenge against Black prospective juror Givan. Defense counsel objected and the following colloquy ensued:

"MR. BLUM [defense counsel]: Defense objects, noting the point that Miss Givan is black. I see no reason—

"THE COURT: Overruled.

"MR. BLUM: Can I just state the basis that it is systematic exclusion.

"THE COURT: Seeing as she is the first black that is seated on the jury, I can't see how you can get systematic exclusion.

"MR. COLLIER [prosecutor]: I would also note for the record that during the *Witherspoon*[4] voir dire, Miss Givan said she can only vote for the death penalty if she was absolutely forced to, and I am not about to place anybody on the jury since that's the only issue—who is going to indicate that."

■ Defendant now contends the prosecutor excused Ms. Givan for racial reasons, thereby violating his right to equal protection under the federal Constitution. (*Batson* v. *Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712].)[5]

In order to establish a prima facie case of discriminatory motive, "the defendant first must show that he is a member of a cognizable racial group, [citation], and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." (*Batson* v. *Kentucky, supra,* 476 U.S. at p. 96 [90 L.Ed.2d at p. 87].) Next, the defendant must show that the totality of the relevant evidence demonstrates the prosecutor was exercising peremptory challenges to exclude venire persons on account of their race. "This combination of factors in the empaneling of the petit jury . . . raises the necessary inference of purposeful discrimination." (*Ibid.* [90 L.Ed.2d at p. 88].) "Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." (*Id.* at p. 97 [90 L.Ed.2d at p. 88]; cf. *Wheeler, supra,* 22 Cal.3d at pp. 280-282 [adopting this same procedure].)

There is no doubt Blacks constitute a cognizable racial group for the purposes of our analysis. (See generally, *Batson* v. *Kentucky, supra,* 476 U.S. 79; *Wheeler, supra,* 22 Cal.3d at p. 280, fn. 26.) However, defendant did not establish a prima facie case of purposeful discrimination or systematic exclusion solely by his observation that one prospective juror peremptorily challenged by the prosecutor was Black. He points to nothing else in the record, nor have we found anything, to support his claim that the prosecutor's challenge to Givan was racially motivated.

*People* v. *Rousseau* (1982) 129 Cal.App.3d 526 [179 Cal.Rptr. 892] is illustrative. In that case the prosecutor challenged the only two Blacks on

---

[4] *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. See also *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844] (revising the *Witherspoon* standard).

[5] Defendant does not allege that the prosecutor's actions in this regard violated his Sixth Amendment or state constitutional right to an impartial jury drawn from a fair cross-section of the community. (See *People* v. *Bell* (1989) 49 Cal.3d 502, 525, fn. 10 [262 Cal.Rptr. 1, 778 P.2d 129]; *People* v. *Wheeler, supra,* 22 Cal.3d 258, 272.)

the jury panel. Counsel objected by merely noting that " 'there were only two blacks on the whole panel, and they were both challenged by the district attorney.' " (*Id*. at p. 536.) The *Rousseau* court found counsel's summary reason, without more, wholly inadequate to shift the burden to the People to provide a racially neutral explanation for the challenge. (*Id*. at pp. 536-537; see also *People* v. *Turner* (1986) 42 Cal.3d 711, 719, fn. 4 [230 Cal.Rptr. 656, 726 P.2d 102].)

As in *Rousseau*, defendant's brief explanation of the basis for his objection ("the first Black prospective juror was challenged"), without more, was insufficient to establish a prima facie showing of systematic exclusion or purposeful discrimination.

### 5. *Denial of a Representative Jury*

 Defendant contends that the exclusion of prospective jurors opposed to the death penalty deprived him of his Sixth Amendment right to a jury chosen from a representative cross-section of the community. We have repeatedly rejected this claim, observing that the exclusion of such jurors is constitutionally permissible. (See *People* v. *Adcox* (1988) 47 Cal.3d 207, 251 [253 Cal.Rptr. 55, 763 P.2d 906]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 753-754 [239 Cal.Rptr. 82, 739 P.2d 1250]; *Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758].)

### 6. *Ex Parte Communication With a Juror*

During voir dire, several venire persons were excused on the basis of anticipated financial hardship, but prospective juror Fascina stated she would not suffer any financial hardship by serving as a juror in defendant's trial, estimated to last six weeks. Fascina was ultimately selected as one of the twelve jurors to try defendant's case. The evidentiary phase of the guilt trial commenced on September 15, 1982. On that same date, Phyllis Sandahl, the personnel administrator for Fascina's employer, wrote to the court relating her company's policy of paying its employees for a maximum of 10 days of jury service and requesting employees to seek excusal from service for any longer period.

The trial judge responded to the employer by letter on September 16, 1982. He noted Fascina was a sitting juror in defendant's case, described the seriousness of the charges, and expressed surprise at the company's 10-day policy, saying he was informed the company would pay Fascina for the duration of the trial. It was further stated in the letter that this new revelation came, "at a very bad time. In order to excuse her in the middle of the trial I would have to declare a mistrial and run the risk of freeing a man

against whom a large amount of evidence has already been presented. I am certain that such a result would not be desired by your company." The court's letter concluded: "Your re-consideration in this matter is vital."

Fascina's employer wrote back the next day to inform the trial judge that Fascina would be allowed 20 paid days for jury service and an extended unpaid leave of absence that would not affect her position with the company.

On September 22, 1982, the jury returned its verdicts of guilt. The trial judge then summoned Fascina, who had served as foreperson of the jury, over for a side-bar discussion. He told her he understood she was not being paid for her service, and asked her if the situation was causing her undue hardship. She replied in the negative. He also asked her if she wished to be relieved; she replied she had come this far and felt it was her duty to continue serving on the jury.[6] Neither the prosecutor nor defense counsel was a party to this conversation, nor had they been notified of the trial judge's letter to Fascina's employer.

Defendant first argues we can infer from the dates on the trial judge's letter and the letters from Fascina's employer that the judge's letter was hand carried. From that he urges Fascina thus "may well have" read the letter, with its arguably misleading statements that the employer's revelation came at a "bad time," that a "large amount" of evidence had been produced, and that to excuse Fascina would "risk" freeing a dangerous man. This information, defendant argues, could have signaled to Fascina that the trial judge believed defendant was guilty, thereby prejudicing Fascina against defendant.

Although the record does not unequivocally establish whether Fascina in fact read the trial judge's letter during trial, it could certainly support such an inference. Phyllis Sandahl, the personnel administrator for Fascina's employer, filed an affidavit in which she stated it "would have been my normal practice to show" the trial judge's letter to Fascina, and she added, "I believe I showed her the letter at that time and that she read it."[7] Furthermore, Fascina's testimony at the hearing to settle the record provides additional evidence from which we may conclude she read the letter.

---

[6] There is a brief mention in the trial transcript of the trial judge calling Juror Fascina over for a conference, but the actual conversation was not reported. We ordered preparation of a settled statement to reconstruct the substance of the conversation.

[7] Although the trial court declined to admit the affidavit into evidence at the hearing to settle the record, defense counsel was permitted to file it with the court as an offer of proof, and the appellate record was thereafter augmented to include the affidavit. Since it is now a part of the record on appeal (Cal. Rules of Court, rule 12(a)), it is unnecessary for us to rule upon defendant's request that we take judicial notice of the affidavit.

She answered in the affirmative when asked if she had "occasion" to read the letter. When she was then asked whether she had read the letter before or after her side-bar conversation with the judge, she replied, "I would think it was before, but I won't swear to it, because I don't know, I don't remember."

Even assuming Fascina read the letter on the day it was written, we conclude no prejudice resulted. While the trial judge may have exaggerated the amount of evidence which, by that point, had been introduced at trial, the ultimate evidence of defendant's guilt was overwhelming—including fingerprint evidence and his confession. Moreover, it must have been fairly obvious to Fascina that the possibility of her being dismissed from the case came at a "bad time, since all concerned had already come through a lengthy voir dire process. Finally, defendant overstates the "ominous tone" of the trial judge's letter; Fascina was already aware of the seriousness of the capital murder and related charges which defendant faced. In short, assuming Fascina read the letter prior to or at the start of trial, under the facts and circumstances she could not have been biased or prejudiced against defendant as a result thereof.[8]

Defendant also argues that the trial judge's ex parte side-bar communication with Fascina requires reversal of all his convictions, claiming the communication violated his constitutional rights to the effective assistance of counsel and to be present at all critical stages of his trial. ▮ It is well settled that the trial court should not entertain, let alone initiate, communications with individual jurors except in open court, with prior notification to counsel. (*Paulson* v. *Superior Court* (1962) 58 Cal.2d 1, 7 [22 Cal.Rptr. 649, 372 P.2d 641].) "This rule is based on the precept that a defendant should be afforded an adequate opportunity to evaluate the propriety of a proposed judicial response in order to pose an objection or suggest a different reply more favorable to the defendant's case. [Citations.]" (*People* v. *Garcia* (1984) 160 Cal.App.3d 82, 88 [206 Cal.Rptr. 468].)

While the rule against ex parte communications with jurors is based on a defendant's constitutional right to personal presence at all critical stages of his trial and on his right to counsel, "[t]here is scarcely a lengthy trial in

---

[8] In November 1987, shortly after filing his opening brief in this direct appeal, defendant filed a petition for writ of habeas corpus in this court, raising the one issue concerning the trial judge's letter to Juror Fascina's employer. It is stated therein that, "The purpose of the present petition is to ensure that the Declaration of Phyllis Sandahl will be considered by the Court in conjunction with the appeal presently pending before the Court." As noted, Sandahl's affidavit has been made part of the augmented record on appeal, and we can therefore directly consider defendant's claims of error concerning the trial judge's letter in this appeal. Accordingly, we have summarily denied the petition for a writ of habeas corpus in No. S002964.

which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial. The . . . conclusion that an unrecorded *ex parte* communication between trial judge and juror can never be harmless error ignores these day-to-day realities of courtroom life and undermines society's interest in the administration of criminal justice." (*Rushen* v. *Spain* (1983) 464 U.S. 114, 118-119 [78 L.Ed.2d 267, 273, 104 S.Ct. 453], italics in original, fn. omitted [per curiam opn.].) Although such communications violate a defendant's right to be present, and represented by counsel, at all critical stages of his trial, and thus constitute federal constitutional error, reversal is not required where the error can be demonstrated harmless beyond a reasonable doubt. (*Rushen* v. *Spain, supra,* at pp. 117-120 [78 L.Ed.2d at pp. 272-274]; *People* v. *Hogan* (1982) 31 Cal.3d 815, 850 [183 Cal.Rptr. 817, 647 P.2d 93]; see *Chapman* v. *California* (1967) 386 U.S. 18, 20-21 [17 L.Ed.2d 705, 708-709, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

Such was the case here. The record and settled statement reflect that Fascina advised the court her continued service on the jury would not cause her any financial hardship. She confirmed that she was never pressured to remain on the jury, and that her decision to continue serving was entirely her own. We conclude that although it was improper for the trial judge to communicate with Fascina without the knowledge of defense counsel (cf. *People* v. *Belmontes* (1988) 45 Cal.3d 744, 815-816 [248 L.Ed.2d 126, 755 P.2d 310]), the error was harmless beyond a reasonable doubt.[9]

### 7. *Corpus Delicti*

Defendant next argues that his convictions for attempted robbery, rape, and burglary, as well as the three special circumstances based on those felonies, must be reversed because the evidence adduced at trial, exclusive of his extrajudicial statements, failed to establish the corpus delicti of those crimes.

In any criminal prosecution, the corpus delicti must be established by the prosecution independently from the extrajudicial statements, confessions or admissions of the defendant. (*People* v. *Towler* (1982) 31 Cal.3d

---

[9] We also reject defendant's further contention that reversal is required because the trial court failed to conduct a full-blown formal hearing on Fascina's fitness to continue serving as a juror. Although the failure to hold such a hearing under compelling circumstances may constitute "an abuse of discretion subject to appellate review" (*People* v. *Burgener* (1986) 41 Cal.3d 505, 519-520 [224 Cal.Rptr. 112, 714 P.2d 1251]), the trial court's failure to do so in this case was clearly harmless. Although a formal contested hearing was not held, the trial court made a sincere attempt to determine Fascina's ability to continue to serve impartially on the jury. The decision to leave her on the jury is supported by substantial evidence. (*Id.* at p. 520.)

105, 115 [181 Cal.Rptr. 391, 641 P.2d 1253]; *People* v. *Mehaffey* (1948) 32 Cal.2d 535, 545 [197 P.2d 12].) The elements of the corpus delicti are (1) the injury, loss or harm, and (2) the criminal agency that has caused the injury, loss or harm. (*Jones* v. *Superior Court* (1979) 96 Cal.App.3d 390, 393 [157 Cal.Rptr. 809].) "The independent proof may be by circumstantial evidence [citation], and it need not be beyond a reasonable doubt. A slight or prima facie showing, permitting the reasonable inference that a crime was committed, is sufficient. [Citations.]" (*People* v. *Alcala* (1984) 36 Cal.3d 604, 624-625 [205 Cal.Rptr. 775, 685 P.2d 1126].) It is not necessary for the independent evidence to establish that the defendant was the perpetrator. (*People* v. *Cullen* (1951) 37 Cal.2d 614, 624 [234 P.2d 1]; *Jones, supra,* at p. 393.)

The corpus delicti rule applies to felony-murder special-circumstance allegations. (*People* v. *Robbins* (1988) 45 Cal.3d 867, 885 [248 Cal.Rptr. 172, 755 P.2d 355]; *People* v. *Mattson* (1984) 37 Cal.3d 85, 93 [207 Cal.Rptr. 278, 688 P.2d 887]; compare *People* v. *Morales* (1989) 48 Cal.3d 527, 559 [257 Cal.Rptr. 64, 770 P.2d 244] [inapplicable to nonfelony-based special circumstances]; *People* v. *Mattson* (1990) 50 Cal.3d 826, 874 [268 Cal.Rptr. 802, 789 P.2d 983].)

 Defendant first argues the People failed to establish the corpus delicti of attempted robbery before admission of defendant's confession. However, defense counsel never lodged an objection on this ground, instead confining his objection to a *Miranda* claim. (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].) By failing to object, defendant cannot now complain the evidence was improperly admitted. (*People* v. *Mitchell* (1966) 239 Cal.App.2d 318, 323 [48 Cal.Rptr. 533].) It may well be that "proof of the corpus delicti was available and at hand during the trial, but that in the absence of [a] specific objection calling for such proof it was omitted." (*Ibid.*)

Defendant obliquely admits the absence of an objection, but contends his trial counsel rendered ineffective assistance because there could be no reasonable tactical reason for declining to object. "It is established that reversal for ineffective assistance of counsel is generally unwarranted unless *the defendant* shows counsel's alleged failings *prejudiced* his defense. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 693-694 [80 L.Ed.2d 674, 104 S.Ct. 2052]; *People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]; *People* v. *Fosselman* (1983) 33 Cal.3d 572, 583-584 [189 Cal.Rptr. 855, 659 P.2d 1144].)" (*People* v. *Williams* (1988) 44 Cal.3d 1127, 1153 [245 Cal.Rptr. 635, 751 P.2d 901], italics in original.)

Since the record provides no clue as to why counsel failed to object, we would normally affirm on appeal and require defendant to proceed via

habeas corpus. (*People* v. *Pope, supra,* 23 Cal.3d at p. 426.) Although this rule does not apply if "there simply could be no satisfactory explanation" for the omission (*ibid.*), it may well be that counsel was aware of additional evidence of attempted robbery aside from defendant's own statements, and did not wish to invite its presentation. (*Mitchell, supra,* 239 Cal.App.2d at p. 323.) On this record, then, we cannot conclude defense counsel was ineffective for failing to object. In any event, the remaining valid special circumstances (*post*) preclude a finding of prejudice.

■ We need not rely on the failure to object to dispose of defendant's further corpus delicti arguments. The partially clothed condition of the victim's body, the evidence of extreme force and violence, and the presence of semen on the external genital area of the victim, together supported a reasonable inference that a rape had occurred. (*People* v. *Morales, supra,* 48 Cal.3d at p. 553.) Defendant's assertion that there was insufficient evidence of penetration is misplaced; there need only be slight evidence of that element of rape, and such may be inferred from the above-mentioned circumstantial evidence. (*Alcala, supra,* 36 Cal.3d at pp. 624-625.) Moreover, the felony-murder-rape special circumstance could be found true based on proof of an *attempted* rape. (§ 190.2, subd. (a)(17)(iii).)

Similarly, we conclude the evidence established the corpus delicti of the crime of burglary. There is no disputing that there was evidence of a forcible rape inside the residence. Although defendant complains there was no independent evidence to establish that he entered without consent (*People* v. *Gauze* (1975) 15 Cal.3d 709, 713-714 [125 Cal.Rptr. 773, 542 P.2d 1365]), this much may be inferred (so as to satisfy the corpus delicti rule) from the circumstantial evidence adduced at trial.

8. *Circumstantial Evidence Instruction*

■ Defendant next argues that the trial court erred by declining to instruct the jury with CALJIC No. 2.01.[10] ■ That instruction con-

---

[10]CALJIC No. 2.01 (1979 rev.) states: "However, a finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion.

"Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must be proved beyond a reasonable doubt.

"Also, if the circumstantial evidence [as to any particular count] is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to

cerns the proper consideration of circumstantial evidence. However, the obligation to give CALJIC No. 2.01 arises only in those cases where circumstantial evidence is " 'substantially relied on for proof of guilt.' " (*People v. Wiley* (1976) 18 Cal.3d 162, 174 [133 Cal.Rptr. 135, 554 P.2d 881], quoting *People v. Yrigoyen* (1955) 45 Cal.2d 46, 49 [286 P.2d 1].) "The reason for this rule is found in the danger of misleading and confusing the jury where the inculpatory evidence consists wholly or largely of direct evidence of the crime. [Citation.]" (*People v. Jerman* (1946) 29 Cal.2d 189, 197 [173 P.2d 805].) "Extrajudicial admissions, although hearsay, are not the type of indirect evidence as to which the instructions on circumstantial evidence are applicable. [Citation.]" (*Wiley, supra,* at p. 174.)

■■■ Defendant contends the People relied largely on circumstantial evidence to prove the rape and burglary charges. However, it is apparent the People placed primary reliance on the following statements defendant made to the police during the postarrest interrogation: (1) that he had forcible intercourse with the victim; (2) that she was alive during the rape; and (3) that he forced his way into the victim's home with the intent to take her money. Given this state of the evidence, the trial court did not err in denying defendant's request for CALJIC No. 2.01.

Defendant concedes his postarrest inculpatory statements were a large part of the People's case. However, he characterizes his statements as contradictory, requiring circumstantial evidence for corroboration. He argues such corroboration was critical to the People's case, and from that concludes that the People "substantially relied" on circumstantial evidence, thereby requiring that the instruction be given. This reasoning has been found suspect. (See *People v. Williams* (1984) 162 Cal.App.3d 869, 874-876 [208 Cal.Rptr. 790] [circumstantial corroborating evidence insufficient to trigger a duty to give CALJIC No. 2.01].) In any case, the record of the confession does not support defendant's claim that he made contradictory statements. Rather, it reveals that defendant unequivocally admitted commission of the rape, the forcible entry, and his larcenous intent. Since the People did not "substantially rely" on circumstantial evidence to prove defendant guilty of rape and burglary, it follows that the trial court correctly denied defendant's request that the jury be charged with CALJIC No. 2.01.[11]

---

his innocence, it is your duty to adopt that interpretation which points to the defendant's innocence, and reject that interpretation which points to his guilt.

"If, on the other hand, one interpretation of such evidence appears to you to be reasonable and the other interpretation to be unreasonable, it would be your duty to accept the reasonable interpretation and to reject the unreasonable."

[11]Defendant also argues that the trial court had a sua sponte duty to give CALJIC No. 2.01 at the penalty phase since the prosecutor relied heavily on circumstantial evidence during his closing argument. Once again, however, the People did not "substantially rely" on the

### 9. Failure to Advise Defendant of the Consequences of the Stipulation Concerning the Victim's Age and His Own Parolee Status

During defendant's trial, counsel agreed to stipulate that the victim was 76 years old at the time of her murder, and that defendant was on parole for armed robbery at that time. Defendant now contends his convictions must be reversed because he was not advised of the consequences of the stipulations, nor was he asked to join in them. He relies on *People* v. *Hall* (1980) 28 Cal.3d 143 [167 Cal. Rptr 844, 616 P.2d 826], wherein this court indicated, in dictum, that "trial courts in the future would be well-advised to assure the record adequately reflects the fact that a defendant is advised of any constitutional rights waived when stipulating to the status of an ex-felon." (*Id.* at p. 157, fn. 9.)

Even if we were to assume that this dictum in *Hall* should properly be extended to the stipulations at issue here, reversal would not be warranted. ▮▮▮ In *People* v. *Wright* (1987) 43 Cal.3d 487 [233 Cal.Rptr. 69, 729 P.2d 260], we held that when a defendant's submission or stipulation is not tantamount to a guilty plea, "[a] trial court's failure to comply with [a] judicial rule of criminal procedure [like that articulated in *Hall*] requires reversal only if it is reasonably probable a result more favorable to the defendant would have been reached if he had been properly advised. [Citations.]" (43 Cal.3d at p. 495, fn. omitted.)

In this case, the factual stipulations appear routine; there is nothing in the record to suggest the People would have had any difficulty proving the victim's age, or defendant's parolee status. Both facts are of a type which are easily verifiable by resort to standard sources. Moreover, we fail to perceive how there could have been any prejudice, since none of the related enhancements actually added an additional term to defendant's overall sentence, but merely made him probation ineligible or prohibited a suspended sentence. Inasmuch as the special circumstance allegations were sustained, the minimum sentence defendant could have received was life imprisonment without the possibility of parole; the possibility of probation or a suspended sentence was nonexistent.

### 10. Dissatisfaction With Counsel

At the July 13, 1981, trial setting conference, defendant first broached the subject of his dissatisfaction with defense counsel. Noting that the book he

---

circumstantial evidence at either the guilt *or* penalty phase. We need not decide whether the giving of CALJIC No. 2.01 would ever be appropriate at the penalty phase of a capital trial. No such sua sponte duty could have arisen on these facts.

was reading (Behind Charles Manson) advised that "the worst thing to get" was an "overworked PD," defendant asserted that he was not getting along with counsel and that he wanted "at least a state appointed attorney." Although defendant did not make a clear and unequivocal request to proceed in propria persona, he made this statement: "And I feel like this—like me and he can't get along. If I got to go down, let me go down by myself because I really don't need no overworked PD trying to help me fight my case when he not [*sic*] going to do nothing for me."

Counsel responded that he had been getting along with defendant until that morning, when counsel told defendant he was too busy to make defendant a copy of the charges against him for his own use. In addition, counsel refused to exchange some money for defendant, saying that was not one of his functions. The matter ended when the trial court advised defendant that his attorney was competent and experienced, and that he stood a better chance of acquittal with counsel's representation than without it.

Defendant next expressed his dissatisfaction with counsel *over a year later*, on August 16, 1982. He complained at that time about counsel's suggestion that he consider pleading guilty, and alleged that counsel was advising him to plead guilty because he wanted to avoid looking silly at trial, thereby damaging his professional reputation. To punctuate his claim that counsel was not competent, defendant noted he had done some checking and discovered that defense counsel "is just a deputy public defender from the public defender's office, and it states, you know, in law on the special circumstances case you're entitled by law to two attorneys and right now I'm facing the special circumstances case and I ain't even got one lawyer, not even one and it says by law you're entitled to two . . . ."

The trial court thereupon informed defendant that his counsel was indeed an attorney. When the court next tried to determine whether defendant had discussed these matters with counsel, defendant began discussing another subject. The trial court interjected: "Wait a minute . . . . [¶] You have to tell me certain things now that I need to know in order for me to make a decision as to whether to relieve [counsel] . . . and let you go pro per."

Defense counsel reported he had told defendant that the evidence of guilt was very strong and that a guilty plea might save his life. He added that he told defendant a strong argument at the guilt phase would not be presented in order to preserve counsel's credibility with the jury at the penalty phase. The trial court informed defendant his attorney knew much more about the case than anyone else, and opined that counsel's initial suggestion that he plead guilty was not a face-saving maneuver, but rather tactical advice based on an appraisal of the strength of the People's evidence. In the course

of this discussion, the trial court commented that counsel "is a person who has tried several cases similar to this before, cases involving the possibility of a death penalty in a murder trial."

### a. *Faretta Error*

Defendant first claims his right to self-representation under *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] was violated. He argues that the trial court's statement concerning counsel's experience in capital cases was false, thereby preventing him from making an informed decision whether to assume the responsibility of his own defense. To support his claim that the court's comment was a misrepresentation, he directs our attention to an April 6, 1982, pretrial hearing at which counsel told the trial judge, outside the earshot of defendant and the jury, that defendant's case was the first special-circumstances murder case he had ever tried. (See Discussion, *ante*, at p. 390.)

Even assuming the accuracy of defendant's factual premises, no *Faretta* error is established. ■■■ "[I]n order to invoke the constitutionally mandated unconditional right of self-representation a defendant in a criminal trial should make an *unequivocal* assertion of that right within a reasonable time prior to the commencement of trial." (*People* v. *Windham* (1977) 19 Cal.3d 121, 127-128 [137 Cal.Rptr. 8, 560 P.2d 1187], italics added; see *People* v. *Bloom* (1989) 48 Cal.3d 1194, 1219-1220 [259 Cal.Rptr. 669, 774 P.2d 698].)

Here, defendant failed to clearly indicate at the August 16, 1982, hearing that he desired to have counsel relieved and to proceed pro se. The record, read as a whole, reveals that defendant was unhappy for two reasons: because he believed counsel was not a "real" attorney, and because at one point counsel advised him to consider pleading guilty. The only possible reference in the record to defendant's desire to proceed without an attorney—a tangential one at that—came at the very early stages when, at the trial setting conference a year earlier, defendant commented: "If I got to go down, let me go down by myself . . . ." And while the trial court mentioned more than a year later, on August 16, 1982, that it was trying to determine whether to relieve counsel and let defendant proceed in propria persona, that comment was made in response to a *Marsden* motion (*People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]; see Discussion *post*, at p. 410), and was directed to defendant's apparent dissatisfaction with defense counsel on that later date.

On this record we conclude that the trial court did not violate defendant's constitutional right to self-representation under *Faretta* v. *California, supra,*

422 U.S. 806, since defendant never made a timely, unequivocal assertion of that right.

### b. *Marsden Error*

Defendant also contends that these same alleged misrepresentations by the trial court regarding counsel's previous experience with capital trial work demonstrate that the court failed to conduct a proper *Marsden* hearing. In *Marsden, supra,* 2 Cal.3d 118, we held that the right of an accused to the effective assistance of counsel may, under appropriate circumstances, include the right to have present counsel discharged and substitute counsel appointed. In order to thoughtfully exercise its discretion whether to discharge present counsel, a trial court is required to listen to a defendant's complaints about his attorney. (*Id.* at pp. 123-124.) "[A] judge who denies a motion for substitution of attorneys solely on the basis of his courtroom observations, despite a defendant's offer to relate specific instances of misconduct, abuses the exercise of his discretion to determine the competency of the attorney." (*Id.* at p. 124.)

It is apparent here that the alleged misrepresentations did not implicate defendant's *Marsden* rights. The record reveals that the trial court patiently listened to defendant's complaints about counsel,[12] asked counsel for his side of the story, and resolved the matter—we might add, to defendant's apparent satisfaction—by explaining that public defenders were indeed "real" attorneys, and that counsel's suggestion that defendant should consider pleading guilty was not a face-saving measure, but an honest appraisal of the strength of the People's case. The record further reflects that defendant never directly requested appointment of substitute counsel, but instead merely expressed some unhappiness with certain aspects of counsel's handling of his case.[13] On this record no *Marsden* error is established.

### c. *Keenan Error*

Defendant next urges reversal is required because the trial court failed to properly consider appointment of a second attorney to assist defense

[12] Defendant asserts the trial court cut him off and would not allow him to speak. This grossly exaggerates the record. Read in context, the comment alluded to merely reflects that the trial judge desired to address defendant's complaints in an orderly fashion, and did not want to allow defendant to engage in a rambling monologue detailing his various complaints. (See Discussion, *ante,* at p. 408.)

[13] Defendant also complains about the trial court's comment at the July 13, 1981, hearing, to the effect that: "I wouldn't have a chance to appoint another lawyer anyhow." Defendant assigns this as an intentional misrepresentation designed to derail his desire for substitute counsel. Read in context, however, the comment was more akin to a wry observation on the length of defendant's explanation, and his reluctance to afford the court an opportunity to address his request for counsel other than the public defender.

counsel. ■■■ Although we have held that appointment of a second attorney in a capital case is authorized under section 987.9 (see *Keenan* v. *Superior Court* (1982) 31 Cal.3d 424 [180 Cal.Rptr. 489, 640 P.2d 108]), the record in this case shows defendant never actually moved for appointment of such counsel. Instead, we interpret defendant's reference to the possibility of second counsel as an attempt to underscore his argument that since he was merely represented by an "overworked PD," he had not been afforded the competent services of a single attorney, let alone two.

We noted in *Keenan*, *supra*, 31 Cal.3d 424, that "in assessing the need for [a second] attorney the court must focus on the complexity of the issues involved, keeping in mind the critical role that pretrial preparation may play in the eventual outcome of the prosecution." (*Id.* at p. 432.) Defendant made no showing of the complexity of issues involved here. Indeed, the mention of "second counsel" first surfaced on August 16, 1982, the day on which counsel announced his readiness for trial. Voir dire commenced only two days later. We deem it unlikely a sufficient showing of the need for second counsel could have been made on this record. Even had a timely and proper request for appointment of second counsel been tendered, on this record the trial court would not have abused its discretion in denying it.

### 11. *Judicial Hostility*

Defendant next identifies 11 instances in which he claims the trial court's comments were sarcastic and disparaging of defense counsel. The instances range from comments during voir dire to comments made when the court ruled upon objections to closing argument at the penalty phase. After examining the record, we are in full agreement with the People that, read in context, the judge's comments do not betray a bias against defense counsel. Indeed, in ruling on defendant's pretrial requests to discharge defense counsel, the trial court voiced considerable praise for counsel's abilities and performance. ■■■ In any case, there were no timely objections to any of the complained-of comments such as would have enabled the court to dispel any misunderstanding with appropriate admonitions. (*People* v. *Ramos* (1982) 30 Cal.3d 553, 576 [180 Cal.Rptr. 266, 639 P.2d 908]; *People* v. *Lanphear* (1980) 26 Cal.3d 814, 836 [163 Cal.Rptr. 601, 608 P.2d 689].) Accordingly, any asserted error is waived on appeal. (*Ibid.*)

### 12. *Ineffective Assistance of Counsel*

Defendant argues that he was deprived of the effective assistance of counsel in various further particulars. We shall address each of defendant's claims seriatim.

### a. *Misrepresentation of Counsel's Skill and Experience*

██ Defendant first argues that counsel's silence in the face of the trial court's erroneous assertion that he had previously tried a death penalty case constituted ineffective assistance. Defendant speculates that counsel's failure to correct the trial court's representations was calculated to preserve a workable, if not amicable, attorney-client relationship. However, he reasons that defense counsel's failure to reveal the truth about his lack of capital trial experience prejudiced him in four possible ways: (1) he was "talked into" waiving his *Faretta* rights; (2) he was denied the right to make an informed decision whether to waive his speedy trial rights; (3) he was similarly denied the right to make an informed decision whether or not to testify; and (4) he would have participated more in trial strategy had he known of counsel's alleged inexperience.

As the People convincingly argue, however, defendant has not demonstrated how the outcome of his trial would have been any different had counsel "corrected" the trial court's misstatement. Although defendant speculates the trial outcome may have been different because he would have taken a more active role in the formation and implementation of the myriad tactical decisions he left to counsel, his argument is unavailing for two reasons. First, trial tactics are ordinarily within the sound discretion of trial counsel. (See, e.g., *People* v. *Haylock* (1980) 113 Cal.App.3d 146, 151 [169 Cal.Rptr. 658].) Second, defendant's hindsight attacks upon counsel's performance are too general to support a conclusion that counsel's omissions prejudiced the verdicts. For example, defendant does not demonstrate how he would have been better off had he not waived his speedy trial rights. In light of the overwhelming evidence of guilt, we conclude that this first ineffectiveness-of-counsel argument is wholly without merit.

### b. *Second Counsel*

██ Defendant asserts counsel should have sought the appointment of second counsel because of his relative lack of experience. However, the circumstance that counsel had not yet tried a death penalty case does not inescapably lead to a conclusion that appointment of second counsel was warranted here, absent some evidence that he was so inexperienced he could not provide effective assistance. (See *People* v. *Gzikowski* (1982) 32 Cal.3d 580 [186 Cal.Rptr. 339, 651 P.2d 1145] [after lead counsel was relieved, second counsel was too inexperienced to continue alone; the trial court abused its discretion by denying a continuance to allow second counsel to associate new lead counsel].) Lack of capital trial experience does not in and of itself establish incompetency. (See *Smith* v. *Superior Court* (1968) 68 Cal.2d 547, 552-553, fn. 1 [68 Cal.Rptr. 1, 440 P.2d 65].) Defendant has not

demonstrated counsel's ineffective performance or the requisite showing of prejudice with bald allegations of inexperience alone.

### c. *Compliance With Discovery*

Defendant next contends defense counsel's questioning of Sergeant Gray at a January 18, 1982, hearing to determine compliance with a previous discovery order was inadequate because counsel merely asked general questions and did not memorialize for the record the particular documents turned over to the defense by the prosecution. But defendant wholly fails to explain how he was prejudiced by counsel's alleged inadequacy at this hearing.

### d. *Exclusion of Family Members From Proceedings*

Defendant argues that counsel was ineffective for failing to object when the prosecutor successfully moved to exclude all potential witnesses, including defendant's mother and uncle. He speculates that these excluded relatives could have assisted trial counsel by observing the demeanor of witnesses, by contributing insights into the probable thinking of jurors, and by lending moral support. In addition, he claims the appearance that his family cared for him and his fate might have impressed the jury to vote for life rather than death at the penalty phase. Fundamentally, potential witnesses are subject to exclusion from the courtroom until called to testify. In any case, these asserted benefits are pure speculation. No grounds are shown for concluding that counsel's "inaction" prejudiced the verdicts.

### e. *Jury Selection*

Defendant launches a variety of arguments by which he seeks to demonstrate that counsel provided ineffective assistance during jury selection. First, he maintains counsel should have excluded more prospective jurors based on their answers to questions concerning the death penalty. He focuses in particular on four jurors, all of whom eventually served on the jury. However, defendant relies on answers by these four jurors given during voir dire which are taken out of context. Read in context, all four jurors affirmed their willingness and ability to listen to the evidence and to follow the instructions as given by the judge.

Defendant also attacks counsel's decision not to utilize nine of his peremptory challenges, claiming such failure "possibly" precluded raising any claim on appeal that the trial court unfairly limited questioning on voir dire. (See *People* v. *Coleman* (1988) 46 Cal.3d 749, 770-771 [251 Cal.Rptr. 83, 759 P.2d 1260].) But even assuming counsel's failure to use his remaining

challenges was unwise, defendant has failed to establish that the trial court committed any prejudicial error during the jury selection process. (*People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1082-1087 [259 Cal.Rptr. 630, 774 P.2d 659].)

Defendant urges us to find counsel incompetent for failing to object during voir dire when the trial court repeatedly "defined" mitigating evidence as something which "makes it better." However, the trial court did not purport to give an exhaustive definition of the term, and the penalty phase instructions ultimately given obviated any prejudice.

Lastly, defendant asserts that counsel should have objected at voir dire when, after mentioning life without possibility of parole and death, the trial judge stated, "Neither penalty has any favor as far as the law is concerned." Taken in context, however, the judge's comments clearly meant that the jury must listen and evaluate the evidence presented at the penalty phase before deciding which penalty was appropriate.

In sum, defendant fails to demonstrate any grounds for reversal for ineffectiveness assistance of counsel during jury selection.

### f. *Failure to Move to Disqualify the Trial Judge*

Defendant contends counsel was ineffective for failing to seek to disqualify the trial judge after he stated that if the jury returned a death verdict, he would "do my job as a judge . . . and I will pronounce that sentence." We cannot discern any prejudice from the court's isolated statement without more. We note further that the People unsuccessfully sought to disqualify the trial judge the very next day for alleged bias *against* the death penalty.

### g. *Section 1538.5 Motion to Suppress*

Defendant argues that counsel was incompetent in failing to notice the discrepancy between the number of pages in the original affidavit in support of the arrest warrant and the photocopies produced for introduction into evidence under Evidence Code section 1501. The record, however, reflects that counsel vigorously pursued the motion to suppress defendant's confession as the product of an unlawful arrest, and we would be hard pressed to find him incompetent solely for failing to notice a small notation on the cover sheet of the original affidavit. In any event, since we have already rejected defendant's substantive challenge to the denial of the suppression motion (*ante,* at pp. 391-392), the requisite showing of prejudice for a successful claim of ineffective assistance of counsel has not been established.

(*People* v. *Fosselman* (1983) 33 Cal.3d 572, 583-584 [189 Cal.Rptr. 855, 659 P.2d 1144].)

h. *Trial Strategy*

Defendant maintains that counsel provided ineffective assistance by conceding defendant's guilt during his guilt phase closing argument. However, the cases defendant cites in support of this claim are inapposite. In both cases—*Young* v. *Zant* (11th Cir. 1982) 677 F.2d 792, 797, and *Francis* v. *Spraggins* (11th Cir. 1983) 720 F.2d 1190, 1193-1194—the defense attorneys effectively conceded their clients' guilt of the charged crimes.

In contrast, here counsel told the jury "it appears fairly clear by the evidence as to what happened," but he then went on to argue there was insufficient evidence to support convictions of the charged felonies. For example, regarding the burglary charge, he argued the People had not proved beyond a reasonable doubt defendant's felonious intent in entering the victim's home. Counsel also attacked the attempted robbery charge, arguing there was no evidence defendant took money from the victim. Finally, counsel argued there was insufficient evidence to sustain the charge of rape.

Clearly, counsel did not abandon the best interests of his client, but instead did his best in the face of the highly incriminating state of the evidence, which included defendant's palm prints left at the murder scene, and his full confession to the police. "[I]t is entirely understandable that trial counsel, given the weight of incriminating evidence, made no sweeping declarations of his client's innocence but instead adopted a more realistic approach . . . . As stated in a recent case, 'good trial tactics demanded complete candor' with the jury. [Citations.] Under the circumstances we cannot equate such candor with incompetence." (*People* v. *Jackson*, *supra*, 28 Cal.3d 264, 292-293.)

13. *Polling of the Jury*

Defendant urges reversal is required because the record seemingly reflects that one of the twelve jurors (Juror Corrales) was not polled for an indication of his agreement with the verdict. ▆▆ However, "[w]here a jury is incompletely polled and no request is made for correcting the error, such further polling may be deemed waived by defendant, who cannot sit idly by and then claim error on appeal when the inadvertence could have readily been corrected upon his merely directing the attention of the court thereto." (*People* v. *Lessard* (1962) 58 Cal.2d 447, 452 [25 Cal.Rptr. 78, 375 P.2d 46].)

II. *Special Circumstances*

1. *Carlos Error*

Defendant argues the special circumstance findings must be set aside because the trial court failed to instruct the jury that proof of intent to kill was essential to sustain the three felony-based special-circumstance allegations. (*Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862].)

We have since overruled *Carlos* in *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], wherein we held that, with respect to the actual killer, the court need not instruct on intent to kill in connection with felony-murder special circumstances. (*Id.* at pp. 1138-1139.)

This record establishes beyond a reasonable doubt that defendant was the actual killer and acted alone, thereby obviating the need for an instruction on intent to kill in connection with the felony-murder special circumstances, and satisfying the Eighth Amendment's requirements as set forth in *Enmund* v. *Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368]. (*Cabana* v. *Bullock* (1986) 474 U.S. 376, 390-391 [88 L.Ed.2d 704, 719-720, 106 S.Ct. 689].)

2. *Validity of the Rape-murder Special Circumstance*

 Defendant contends we must reverse the rape-murder special-circumstance finding because there was insufficient evidence that defendant killed Mrs. Hunter in order to facilitate or advance the rape. He argues the evidence demonstrates at best that he went to the victim's home to rob her, commenced beating her when she began screaming, and then decided to rape her as an "afterthought" after he saw her lying on the floor. Thus, he reasons, there was insufficient evidence that he killed Mrs. Hunter in order to advance an independent felonious purpose with respect to the rape.

The pertinent statutory language requires proof that the "murder was committed while the defendant was engaged in . . . the commission of, attempted commission of, or the immediate flight after committing or attempting to commit the following felonies: . . . [¶] (iii) Rape in violation of Section 261." (§ 190.2, subd. (a)(17).)

"In *People* v. *Green* [(1980)] 27 Cal.3d 1, 61 [164 Cal.Rptr. 1, 609 P.2d 468], a case in which the 'felony murder' special circumstance of the 1977 death penalty law was construed, this court held that the special circumstance was inapplicable to cases in which the defendant intended to commit

murder and only incidentally committed one of the specified felonies while doing so. We explained in *People* v. *Robertson* (1982) 33 Cal.3d 21 [188 Cal.Rptr. 77, 655 P.2d 279], however, that when the defendant has an independent purpose for the commission of the felony, and it is not simply incidental to the intended murder, *Green* is inapplicable." (*People* v. *Clark* (1990) 50 Cal.3d 583, 608 [268 Cal.Rptr. 399, 789 P.2d 127]; see generally *People* v. *Kimble* (1988) 44 Cal.3d 480, 499-503 [244 Cal.Rptr. 148, 749 P.2d 803].)

The evidence here supports the inference that after defendant raped the victim, he realized she could identify him since he lived just down the street from her, and therefore killed her to prevent her identification of him as her assailant. Indeed this was precisely the theory of the case which the prosecutor presented to the jury in closing argument,[14] and the jury was properly instructed on the law in this regard.[15]

We conclude there is substantial evidence to support the rape-murder special circumstance consistent with the rule in *People* v. *Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468].

III. *Penalty Phase*

1. *Witherspoon/Witt Error*

Defendant contends that two prospective jurors, Calderon and Murphy, were improperly excused for cause under *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, because they did not make it clear at voir dire that they "would *automatically* vote against the imposition of capital punishment without regard to the evidence that might be developed at the trial . . . ." (*Id.* at p. 522, fn. 21, italics in original [20 L.Ed.2d at p. 785].)

"The United States Supreme Court recently modified the *Witherspoon* standard in *Wainwright* v. *Witt* (1985) 469 U.S. 412, and we adopted that modification in *People* v. *Ghent* (1987) 43 Cal.3d 739, 767-769 [239

---

[14]The prosecutor argued to the jury: "The defendant was on parole for armed robbery from San Quentin. She was a neighbor, lived a half a block from him. [¶] He says in the tape she knew who he was. She could identify him, send him back to prison immediately. [¶] He intended to murder the moment he decided to go in and rob her. She had to be eliminated as a witness. She could send him back to prison."

[15]The jury was instructed with the 1980 revision of CALJIC No. 8.81.17, which in pertinent part requires a finding "that the murder was committed in order to carry out or advance the commission of the crime of attempted robbery, rape or burglary, or . . . [to] facilitate the escape or to avoid detection. [¶] In other words, the special circumstances referred to in these instructions are not established if the attempted robbery, rape or residential burglary was merely incidental to the commission of the crime of murder."

Cal.Rptr. 82, 739 P.2d 1250]. The new standard is whether a juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' (*Wainwright* v. *Witt, supra*, 469 U.S. at p. 424.)" (*People* v. *Walker* (1988) 47 Cal.3d 605, 624 [253 Cal.Rptr. 863, 765 P.2d 70]; see *People* v. *Guzman* (1988) 45 Cal.3d 915, 954-956 [248 Cal.Rptr. 467, 755 P.2d 917].)[16]

Prospective juror Calderon initially stated she would not automatically vote against either a first degree murder verdict or the special circumstances, but that her decision would depend on the evidence. She then began equivocating, however, saying she would have trouble voting for the ultimate penalty and that it was a difficult decision. When the court interjected and asked whether she could vote for the death penalty if the aggravating factors outweighed the mitigating factors, she stated she did not know. When the court asked if she could set aside her personal feelings and apply the law, she responded, "I don't believe in the death penalty, so what can I do?" The clear implication was that she felt bound by a higher authority than the law. This was consistent with her earlier affirmation that she believed only God should take a life. Our review of her voir dire supports the court's determination that she held views regarding the death penalty that would substantially impair the performance of her duties as a juror. She was properly excused.[17]

Prospective juror Murphy stated there was no evidence the People could present that would convince her to vote for the death penalty. When defense counsel posed a hypothetical, she first affirmed her inflexible position but then relented somewhat, saying she did not think she could vote for death. Upon further questioning she expressed a concern over the sanity of the accused, saying, "Well, if they would judge the person who did it and they think he was sane, I might vote for it, but if they thought he was crazy, I wouldn't—or not too bright, I wouldn't vote for it."

Defendant's chief complaint appears to be that the trial court did not afford counsel enough leeway in questioning Murphy about whether her

[16] Defendant asserts we should not apply the *Witt* standard "retroactively." We have applied *Witt* retroactively in recent cases (see, e.g., *People* v. *Guzman, supra*, 45 Cal.3d at pp. 954-956), and we are satisfied that our practice is in conformity with constitutional principles.

[17] We doubt Calderon would have remained on the jury in any event. While defense counsel objected to her removal for cause, we note that when defense counsel tried to clarify one of Calderon's answers she blurted out she had to "get off" the jury, explaining she was raped as a young girl and desired to be disqualified on that ground. She later added she wanted to disqualify herself from the murder case because she was "very nervous." As is apparent, there was ample reason to doubt whether Calderon would be able to properly perform her duties as a juror.

reluctance to vote for the death penalty was due to her belief that the death penalty could be imposed on insane defendants. While we do not rule out the possibility that this prospective juror could have tendered further inconsistent answers, her ultimate responses to the *Witherspoon/Witt* voir dire were unequivocal; she could not vote to impose the death penalty. She was therefore properly excused.

Lastly, defendant maintains that the trial court unfairly limited each side's *Witherspoon* voir dire to three questions per prospective juror. The court had elected to ask all the venire persons the same standardized questions designed to determine whether they were excludable under the *Witherspoon* standard. After this fairly lengthy procedure, the court determined that the three-question-per-side limit was reasonable, affording adequate opportunity for both sides to clarify any ambiguous responses from the venire persons.

We perceive no prejudice from the procedure utilized here. ■■ The right to voir dire, like the right to peremptorily challenge (see *People* v. *Coleman, supra,* 46 Cal.3d 749), is not a constitutional right but a means to achieve the end of an impartial jury. (*People* v. *Bittaker, supra,* 48 Cal.3d 1046, 1087.) Although the judge cannot reserve voir dire for himself or herself and wholly exclude counsel's participation (*id.* at p. 1084, & fn. 21; *People* v. *Hughes* (1961) 57 Cal.2d 89, 94-95 [17 Cal.Rptr. 617, 367 P.2d 33]), we have observed that it is the duty of the trial judge to restrict the examination of the prospective jurors within reasonable bounds so as to expedite the trial. (*People* v. *Crowe* (1973) 8 Cal.3d 815, 828, fn. 22 [106 Cal.Rptr. 369, 506 P.2d 193] [no error where the trial judge questioned the venire persons himself assisted by written questions submitted by counsel]; see *People* v. *Hernandez* (1979) 94 Cal.App.3d 715, 719 [156 Cal.Rptr. 572]; *People* v. *Semone* (1934) 140 Cal.App. 318, 326 [35 P.2d 379].) We reiterate: "[C]ounsel's right is only to a *reasonable* examination of prospective jurors—reasonable in length, in method, in purpose, and in content." (*Crowe, supra,* 8 Cal.3d at p. 828, italics in original.)

In this case the court's own questioning of the prospective jurors was fairly thorough and lengthy. Counsel for each side was permitted to clarify any ambiguous responses by the jurors. It does not appear counsel was prevented from making *reasonable* inquiry into the fitness of any venire person to serve on the jury. ■■■■ Nor has defendant shown that any one juror ultimately seated on his petit jury was incompetent or not impartial.[18] We therefore find no prejudicial error. (*Bittaker, supra,* 48 Cal.3d at p. 1087.)

---

[18] Defendant also complains that the court was one sided in its rulings during voir dire, repeatedly sustaining objections to proposed defense voir dire questions. However, examination of the record reveals that the questions to which the prosecutor objected appeared designed

## 2. *Substituting in Alternate Juror at the Penalty Phase*

On September 28, 1982, just prior to the testimony of the first penalty phase witness, the trial court announced that Juror Zalamea had become seriously ill and would have to be excused. Alternate Juror Lutz was chosen to take Zalamea's place and was seated on the jury. There was no objection to the substitution and no additional jury instructions were given explaining the substitution to the jury.

■■■ Defendant contends reversal is required because the trial court failed to instruct the jury to disregard all past deliberations and begin deliberating anew. (*People* v. *Collins* (1976) 17 Cal.3d 687 [131 Cal.Rptr. 782, 552 P.2d 742].) However, he concedes that *Collins* is factually distinguishable from this case. In *Collins* the jury had already begun deliberating when the substitution of jurors occurred. Thus, the need for cautionary instructions was great. By contrast, the substitution of jurors in this case occurred prior to the first witness's testimony at the penalty phase. Since the jury had not yet heard any penalty phase evidence or commenced deliberations on the question of penalty, there were no "deliberations" to "begin anew."

Defendant acknowledges that Lutz "had been present and had heard all the evidence at the guilt/special circumstance phase," and that "therefore [she] was in a position to evaluate the case based on all the evidence at all stages of the trial." Moreover, the jury was instructed at the penalty phase to consider "all of the evidence which has been received during any part of the trial of this case," including "the circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true . . . ." (§ 190.3, factor (a).)

We have previously rejected an identical claim in *People* v. *Brown* (1988) 46 Cal.3d 432 [250 Cal.Rptr. 604, 758 P.2d 1135], wherein we concluded that "the *Collins* instruction was not necessary to insure the preservation of the 'essential elements of trial by jury . . . .' ([17 Cal.3d] at p. 692.)" (46 Cal.3d at pp. 460-461.) We reach the same conclusion here; there is no basis upon which to conclude that defendant suffered any prejudice due to the trial court's failure to fashion, sua sponte, a modified *Collins* instruction.

---

to educate the prospective jurors on the particular facts of this case (e.g., is life without the possibility of parole an appropriate sentence for someone who robs, rapes, and kills an elderly woman?), rather than to assess their impartiality and ability to follow the law. It is settled that it is not a proper function of the examination of prospective jurors to seek to educate them as to the particular facts of the case, compel them to commit themselves to vote a particular way, indoctrinate them, or otherwise prejudice them for or against a particular party. (See *People* v. *Crowe, supra*, 8 Cal.3d at pp. 824, 828, and cases cited.)

### 3. *Misener Error*

One day prior to the first day of testimony at the guilt phase, the prosecutor moved to compel defense counsel to give a copy of Dr. Maloney's report to the People. Defense counsel responded, "Your Honor, I have indicated that I probably will call Dr. Maloney, but I have not made a final decision to call Dr. Maloney, and I don't believe it's necessary this early in the case on that basis to give the prosecution that kind of discovery. [¶] I would object to having to give him such discovery at this time." Acknowledging the motion was somewhat premature since all concerned anticipated Dr. Maloney would testify at the penalty phase only, the trial court ruled that defense counsel would have to turn over a copy of Dr. Maloney's report after the fourth day of testimony at the guilt phase, or the close of the People's case-in-chief, whichever came first. Defense counsel stated "[f]or the record, the defendant objects, feels that's too early."

 Defendant asserts we must reverse the penalty verdict because the trial court's decision to permit prosecutorial discovery was contrary to our decision in *In re Misener* (1985) 38 Cal.3d 543 [213 Cal.Rptr. 569, 698 P.2d 637]. In *Misener, supra,* we were confronted with the constitutionality of section 1102.5, which permitted prosecutorial discovery of statements, oral or written, of any defense witness other than the defendant, after that witness had testified on direct examination. We invalidated the statute on the ground it contravened the state constitutional privilege against self-incrimination. (*People* v. *Robbins, supra,* 45 Cal.3d 867, 882.)

Defendant's trial took place prior to the effective date of section 1102.5, and nearly three years prior to the filing of *Misener* and our announcement of the principles discussed therein. Even assuming cognizable *Misener* error here, any such error was clearly not prejudicial to defendant.[19]

---

[19] In *People* v. *Robbins, supra,* 45 Cal.3d 867, an automatic appeal, we found *Misener* error harmless under the state constitutional miscarriage-of-justice test. (Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) In *Robbins,* trial counsel had refused to comply with the court's order to furnish discovery to the prosecution of defense witnesses' extrajudicial tape-recorded statements, for possible use in impeaching those witnesses *at the guilt phase.* The *Misener* error in *Robbins* was manifested by an instruction to the jury that defense counsel's refusal to furnish such discovery, in violation of the court's order, could be considered in assessing the credibility of the defense witnesses, whose testimony, the jury was further instructed, was to be viewed with caution. (45 Cal.3d at pp. 881-882.)

In this case the prosecutor was furnished discovery of Dr. Maloney's report, which he thereafter utilized in cross-examination of the witness *at the penalty phase.* Thus, although we applied the *Watson* harmless error test to the *Misener* error in *Robbins,* here the applicable test for prejudice is that which we subsequently announced in *People* v. *Brown, supra,* 46 Cal.3d 432, for assessing the effect of state-law error at the penalty phase of a capital trial: the "reasonable-possibility test." (*Id.,* at p. 448.)

The prosecutor's cross-examination of Dr. Maloney was a routine inquiry into the doctor's impressions of defendant, a discussion of defendant's low intelligence as evidenced by his scores on standardized intelligence tests, and whether defendant could be malingering. Our review of the record reveals only two instances in which it was apparent the prosecutor was aware of the basis of Dr. Maloney's opinions—since the prosecutor asked about specific reports which the doctor had apparently reviewed at defense counsel's request. However, Dr. Maloney explained that defense counsel provided a wealth of prior reports, and that he could not remember the conclusions of any particular report. In response, the prosecutor read the conclusions from two of these prior reports and asked Dr. Maloney whether he agreed with the statements.

The first statement was, "That the defendant does not suffer from mental retardation but rather from a long history of a calculated effort not to learn." Dr. Maloney agreed with the first part of that statement, and disagreed with the malingering conclusion. The second statement was, "That the defendant attempts to sell his emotional disturbance as being the cause of his crime rather than accept the reality that his crime was more of an answer to economic need." Dr. Maloney testified, "I don't think he did that with me. He certainly wasn't presenting himself as emotionally disturbed." In response to the prosecutor's further inquiry whether defendant was manipulative, Dr. Maloney replied, "I think he certainly could be and may have been, but I would still say that his overall presentation to me is not similar to what I see when I know people are manipulative or malingering."

As is apparent, the prosecutor's advance knowledge of Dr. Maloney's report did not result in prejudicial testimony on cross-examination. We conclude it is not reasonably possible the jury would have rendered a different penalty verdict had the *Misener* error not occurred. (*People* v. *Brown, supra,* 46 Cal.3d at p. 448.)

4. *Notice of Aggravating Factors*

Defendant contends the prosecutor failed to give him proper notice of his intent to call several witnesses who described defendant's poor adjustment in prison, including his threats and violent outbursts.

"Section 190.3 provides in relevant part: 'Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial.' The purpose of the statutory notice is to advise the accused of the

evidence against him so that he may have a reasonable opportunity to prepare a defense for the penalty phase of trial. (See *People* v. *Miranda* (1987) 44 Cal.3d 57, 96 [241 Cal.Rptr. 594, 744 P.2d 1127].)" (*People* v. *Walker, supra,* 47 Cal.3d at p. 637.)

The prosecutor filed written notice with the court prior to trial indicating his intent to introduce "Certified copies of official records of the California Department of Corrections regarding threatening and violent behavior by the defendant while incarcerated in prison." Defendant argues his counsel relied on this written notice and believed no live testimony would be offered on the matter of his conduct while incarcerated.

The record, however, does not substantiate defendant's claim. At an August 18, 1982, pretrial hearing, the prosecutor stated he told defense counsel he was "in the process of obtaining certain records concerning Mr. Wright's conduct in prison, certain things . . . [defense counsel] and I have already discussed. One was an incident where Mr. Wright threw a chair at a parole hearing during the course of the hearing. [¶] There may be certain other incidents that come to light, and I should receive all of this information within the next few days. [¶] *There may be some witnesses we want to call with regard to incidents that occurred while the defendant was in prison.* I will give this information concerning the witnesses to . . . [defense counsel] immediately upon receiving it and will put it on the record." (Italics added.)

After the guilt phase but prior to the penalty phase, defense counsel objected to the admissibility of live testimony from the various witnesses, saying he had believed the prosecutor's written notice was an exhaustive list. The prosecutor in turn disputed counsel's assertion, saying, "we didn't list all of the witnesses, *but I did indicate to him prior to our starting the trial that I did intend to call the witnesses,* but I didn't have the records, and I would list the actual witnesses when I got ahold [*sic*] of the records, which I did. He had the records before. He had read through all these records before I ever read them. He knew who those witnesses were." (Italics added.) Significantly, counsel did not contradict the prosecutor's claim that he gave counsel pretrial oral notice that witnesses would be called. And although counsel's request for a "one month" continuance was denied, the witnesses' testimony was not introduced until a full eleven days after the trial court had ruled upon its admissibility. (Cf. *People* v. *Howard* (1988) 44 Cal.3d 375, 419-425 [243 Cal.Rptr. 842, 749 P.2d 279].)

We are satisfied there was substantial compliance with section 190.3. (*Walker, supra,* 47 Cal.3d at p. 637.) In any event, in light of our conclusion that the underlying evidence in question did not prejudice the penalty ver-

dict (*post*, p. 429), any failings regarding notice could not have been prejudicial. (*People* v. *Brown, supra,* 46 Cal.3d at p. 459.)

### 5. *Trial Court Comment on Testimony of Defendant's Mother*

While questioning defendant's mother at the penalty phase, defense counsel elicited the information that defendant's sister is stable, employed, and never had any trouble with the law. He then asked, "How do you account for the fact that Bronte and his sister have the same upbringing, suffered similar beatings, things of that nature, yet Bronte is in the position he is in and your daughter has never even had a problem with the law?" The prosecution objected, arguing lack of foundation and that the question called for speculation. The trial court sustained the objection and commented: "Well, I think that's a problem . . . which society has been trying to solve for ages. [¶] I don't think that this mother's opinion would be of any greater value than any other mother's opinion. [¶] Why does one son become a doctor and the other a bum? [¶] If we knew that, we would be a lot further than we are now."

Defendant argues the court's comment prejudiced the jury against him by characterizing him as a "bum" and belittling his mother's ability to accurately answer the question posed. However, the failure to object waived any claim of error on appeal. (*People* v. *Green, supra,* 27 Cal.3d at p. 27.)

Defendant concedes there was no objection but claims an objection would have been futile. We disagree. Read in context, the court's comment was rhetorical; the judge was not suggesting he believed defendant was a "bum" any more so than he believed defendant's mother had a son who became a doctor. Had counsel objected and sought an appropriate curative admonition, such would have undoubtedly been forthcoming. Nor has defendant offered anything further to substantiate his alternative claim that the failure to object to the court's generalized comment constituted prejudicial ineffective assistance of counsel.

Lastly, defendant argues the trial court erred in sustaining the prosecutor's objection that counsel's question to defendant's mother lacked foundation and called for speculation. Assuming arguendo any error, it was clearly nonprejudicial. Wilson ultimately described defendant's difficult childhood and upbringing to the jury in considerable detail. She was permitted to testify that in her opinion defendant was "very immature," that he had the "mentality" of a 13-year-old, that her son's incarceration in the California Youth Authority was merely "custodial," that as far as she was concerned no real attempt was ever made to rehabilitate him, and that in her opinion

defendant did not have a violent or explosive temper and was not a dangerous individual.

### 6. Nonstatutory Aggravating Evidence (Boyd Error)

 Defendant challenges the admission of the penalty phase testimony of nine witnesses, each of whom recounted defendant's threats and maladjustment while in prison. Specifically, he challenges the testimony of: (1) Linda Brown (who overheard defendant threatening Correctional Officer Duran that Duran's "body" would be the next one found in the recreation shack (an inmate's dead body had been discovered in the shack fifteen minutes earlier)); (2) John Bauer (who reported defendant's threat that someone would die if he were transferred); (3) William Nyberg (who was present when defendant threw a temper tantrum when told he would be transferred to restrictive housing); (4) Teri Gelatini (a female San Quentin Prison kitchen worker who was subjected to defendant's verbal abuse when he became upset because she was no longer "tolerant" of him); (5) Gregory Avila (a prison counselor to whom defendant said he would just take what he wanted when he got out of prison); (6) Harold Bard (another counselor who reported to the jury that defendant was housed at the adjustment center in San Quentin Prison where violent inmates are housed); (7) Jose Ochoa (who heard defendant's promise that he would injure someone if transferred); (8) Ernest Cook (a correctional counselor to whom defendant stated he liked to do "freaky things" to women); and (9) John Williams (who overheard defendant say he intended to kill several people when released from prison).

Three years after the trial in this case, this court decided *People* v. *Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782], in which we held that under the 1978 death penalty law, "[t]he admission of prosecution evidence irrelevant to the enumerated factors [set forth in section 190.3] would be inconsistent with the provisions in the 1978 law which expressly bar evidence of nonviolent crimes except for felony convictions." (*Id.* at p. 774.) We concluded in *Boyd* that, "[c]onsequently the prosecution's case for aggravation is limited to evidence relevant to the listed factors exclusive of factor (k) . . . ." (*Id.* at p. 775.) We further construed the term "criminal activity" used in section 190.3, factor (b) ("the presence or absence of other criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence") as limited to conduct *that violates a penal statute.* (*People* v. *Boyd, supra,* 38 Cal.3d at p. 772.)

Some of the testimony challenged here was *nonstatutory* aggravating evidence inadmissible under the principles subsequently announced in *Boyd* because it did not directly involve defendant's conduct or threats—i.e.,

Correctional Counselor Bard's testimony that defendant had been housed at the adjustment center where violent inmates were routinely housed.[20] And although much of the testimony challenged did involve defendant's "use or attempted use of force or violence or the express or implied threat to use force or violence," it was nevertheless excludable because the violent acts or threats of violence did not amount to "criminal activity" in violation of a penal statute. (*Boyd, supra,* 38 Cal.3d at p. 772.)

We have never held that *Boyd* error *alone* constituted reversible error. (See *People* v. *Boyd, supra,* 38 Cal.3d at p. 779 [admission of nonstatutory aggravating evidence concerning nonviolent escape attempt, threats of violence, violation of parole, failure to cooperate with rehabilitation programs, and reputation for violence, discussed solely for guidance on retrial; reversal of special circumstances and penalty verdict predicated on *Carlos* error (*Carlos* v. *Superior Court, supra,* 35 Cal.3d 131)]; *People* v. *Phillips* (1985) 41 Cal.3d 29, 82-83 [222 Cal.Rptr. 127, 711 P.2d 423] [1977 death penalty law—erroneous admission of evidence of defendant's murderous plots not amounting to "actual crimes"; reversal predicated on compounded effect of failure to instruct on reasonable doubt under *People* v. *Robertson* (1982) 33 Cal.3d 21 (188 Cal.Rptr. 77, 655 P.2d 279)].) Past cases in which we have found *Boyd* error nonprejudicial include *People* v. *Burton* (1989) 48 Cal.3d 843, 863-864 [258 Cal.Rptr. 184, 771 P.2d 1270] (erroneous admission of nonviolent juvenile adjudications); *People* v. *Walker, supra,* 47 Cal.3d at pages 639-640 (threat to kill undercover police officer); *People* v. *Coleman, supra,* 46 Cal.3d at page 788 (threat to prison guard); *People* v. *Brown, supra,* 46 Cal.3d at page 449 (instigation of food riot, threats of sexual and other violence); *People* v. *Boyde* (1988) 46 Cal.3d 212, 249-250 [250 Cal.Rptr. 83, 758 P.2d 25], affirmed *sub nom. Boyde* v. *California* (1990) 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190] (no effort to reform while on California Youth Authority parole, victim-impact of other offenses, two nonnoticed violent offenses); *People* v. *McLain* (1988) 46 Cal.3d 97, 110 [249 Cal.Rptr. 630, 757 P.2d 569] (six instances of prior threats of violence, including threats of escape and willingness to kill a police officer); *People* v. *Belmontes, supra,* 45 Cal.3d 744, 809 (prior possession of handgun with statement that it was "all the protection (defendant) needed"); *People* v. *Silva* (1988) 45 Cal.3d 604, 636 [247 Cal.Rptr. 573, 754 P.2d 1070] (threat to kill guard); *People* v. *Lucky* (1988) 45 Cal.3d 259, 303 [247 Cal.Rptr. 1, 753 P.2d 1052] (drug addiction and manipulative behavior on parole); and

---

[20] Correctional Counselor Bard was initially called by the People to testify about a conversation he had with defendant in which defendant stated he liked to commit robberies. This particular testimony was ruled inadmissible for lack of adequate notice under section 190.3. However, Bard was permitted to testify that defendant had been housed at the adjustment center where violent inmates were housed.

*People* v. *Williams, supra,* 44 Cal.3d 1127, 1147 (reference to guilt phase evidence of escape plan and threat to kill witness).

Turning to the question of prejudice in this case, the People argue that the *Boyd* error was harmless because the improperly admitted evidence could not have prejudiced defendant in light of the other, properly admitted aggravating evidence. We agree.[21]

The circumstances of these crimes were compelling: defendant stood convicted by this jury of the first degree murder, burglary, rape, and attempted robbery of a 76-year-old widow. Enhancement allegations that he had used a deadly weapon, inflicted great bodily injury on a victim of advanced age, and that he had been on parole following a term of imprisonment for a violent felony in which he had used a handgun, were all sustained. The jury found true three felony-murder special-circumstance allegations. Defendant initially denied involvement and thereafter confessed to the crimes, admitting that he had persuaded the victim to open her front door by ruse for the purpose of robbing her since she was an "easy mark," and that he forced entry into her home, savagely beat her, at some point attempted to rape her—accomplishing ejaculation—and murdered her, although he claimed it was not "intentional." No defense evidence was presented at the guilt phase.

At the penalty phase, extensive evidence was introduced documenting defendant's criminal history. In 1972 he was convicted of second degree

---

[21] The People also contend that the *Boyd* error was harmless because the improper aggravating evidence would have been admissible on rebuttal anyway.

Although nonstatutory evidence is inadmissible under *Boyd*, nonstatutory mitigating evidence is admissible under section 190.3, factor (k). "Once the defense has presented evidence of circumstances admissible under factor (k) . . . prosecution rebuttal evidence would be admissible as evidence tending to 'disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.)" (*Boyd, supra,* 38 Cal.3d at p. 776; see also *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 791-792 [230 Cal.Rptr. 667, 726 P.2d 113].) More particularly, "[e]vidence of future dangerousness may be introduced in rebuttal when the defendant himself has raised the issue of performance in prison and offered evidence that in a prison environment he would be law-abiding. (*People* v. *Malone* (1988) 47 Cal.3d 1, 31 [252 Cal.Rptr. 525, 762 P.2d 1249].)" (*People* v. *Mattson, supra,* 50 Cal.3d at p. 878.)

There is merit in the People's assertion that since defendant's mother testified he never received rehabilitative assistance while incarcerated, and that she did not think he had a violent temper or that he was dangerous, much if not all of the evidence excludable under *Boyd* in the first instance would nevertheless have been admissible *in rebuttal.* However, defendant counters that had he known the challenged evidence was only admissible on rebuttal, he would have refrained from asking defendant's mother any questions that would have opened the door to rebuttal testimony by Department of Corrections employees. Given the tenor of the penalty phase defense, it is questionable whether counsel would have so tailored Mrs. Wilson's testimony. On the other hand, the challenged evidence was introduced before Mrs. Wilson's testimony, and not by way of rebuttal. In any event, given our conclusion that the evidence was nonprejudicial to the penalty verdict, the point need not be belabored.

burglary, having forced entry into the home of an 80-year-old woman along with an accomplice and ransacked the residence in search of money. During the episode defendant directed his accomplice to hold the victim, and he constantly had to be reminded not to harm her. An unsuccessful attempt was made to force a ring from the woman's finger.

Evidence was presented that in 1974, defendant robbed two different female victims at gunpoint in a Pasadena bank parking lot, stealing their wallet and purse, respectively. The trial court also took judicial notice that defendant had been convicted of two additional 1974 robberies involving the use of a handgun against female victims.

Evidence was also presented that in 1977, defendant, armed with a shotgun, robbed a Glendale motel desk clerk of between $200 and $300, forcing his victim to remove his trousers and stay in a closet until defendant made good his escape. Four days later, defendant entered a Glendale convenience store wearing a ski mask and robbed the female clerk at gunpoint. The clerk's boyfriend was present in the store and was ordered by defendant to lie on the ground. Defendant was apprehended in possession of the stolen money and a handgun. The gun was fully operational; a bullet in the chamber exhibited an indentation demonstrating that the firing pin had struck the shell casing but the round had misfired. As a result of this incident defendant was convicted of first degree robbery with use of a handgun, and assault with intent to commit robbery.

Finally, in mid-1977, defendant used a razor blade to slash the abdomen of his county jail cellmate, resulting in his conviction of assault with a deadly weapon.

In *Brown, supra*, 46 Cal.3d 432, "[w]e . . . emphasize[d] that a 'mere' or 'technical' possibility that an error might have affected a verdict will not trigger reversal. Instead, when faced with penalty phase error not amounting to a federal constitutional violation, we will affirm the judgment unless we conclude there is a reasonable (i.e., realistic) possibility that the jury would have rendered a different verdict had the error or errors not occurred." (*Id.* at p. 448.)[22]

The evidence that, while in prison, defendant announced he would steal or kill upon his transfer or release, once threw a "temper tantrum," once voiced pleasure at doing "freaky things" to women, on one occasion verbally abused a kitchen worker he felt was no longer tolerant of him, and at

---

[22] The *Boyd* rule (*supra*, 38 Cal.3d 762, 774-775) is founded on statutory, rather than constitutional, interpretation. (See *People* v. *Brown, supra*, 46 Cal.3d at p. 456 [noting that the *Boyd* rule is not based on the federal Constitution].)

some point was housed in the adjustment center, simply pales in comparison to the facts of the crimes of which he was convicted here, and his substantial criminal history. Defendant raped, robbed and violently beat to death a 76-year-old woman in the instant episode; robbed an 80-year-old female victim in 1972; committed four armed robberies at gunpoint in 1974; committed an armed robbery (with a shotgun) in 1977, during which incident he forced his victim to disrobe in a closet; held up a convenience store clerk at gunpoint four days later, assaulted the clerk's boyfriend, and unsuccessfully attempted to fire off a shot; and twice slashed his county jail cellmate in the abdomen with a razor.

We have concluded that the erroneous introduction of evidence of defendant's threats while incarcerated—inadmissible under *Boyd* (*supra*, 38 Cal.3d 762)—was essentially cumulative to defendant's admissible, proven history of violent criminal conduct and recidivism. Although evidence that defendant threatened to harm persons within the prison was erroneously admitted, the jury had before it competent admissible evidence that he had actually assaulted his cellmate with a razor in 1977, twice slashing that victim in the abdomen. Although testimony that defendant told a prison counselor he liked to do "freaky things with the ladies" was erroneously admitted at the penalty phase, this jury had already found that defendant raped his 76-year-old victim in the course of murdering her.[23] The jury could not in reasonable possibility have drawn any more damaging inferences from the inadmissible evidence of defendant's maladjustment and threats of violence while in prison than had already been established by the circumstances of these crimes and defendant's history of violent crime and recidivism. (Accord *Burton*, *supra*, 48 Cal.3d at p. 864.)

"On this record, given the properly admitted evidence of defendant's substantial criminal history and the circumstances of the instant offenses, there simply is no reasonable possibility the jury's penalty verdict was affected by the inadmissible evidence. (*People* v. *Brown* (1988) 46 Cal.3d 432, 449 [250 Cal.Rptr. 604, 758 P.2d 1135]." (*Burton*, *supra*, 48 Cal.3d at p. 864.)

### 7. *Exclusion of Dr. Meyers's Report*

Prior to the commencement of the penalty phase, defendant moved to admit a 10-year-old psychiatric evaluation of him by Dr. Thomas Meyers, a

---

[23] Appellate counsel himself acknowledged at oral argument that: "The 'freaky things with women' (*sic*) remark, well, in a vacuum, might not have meant anything because it is difficult to tell what [it] was intended by Mr. Wright to have meant at the time he spoke it . . . ." Counsel further opined that "the threat, if one can call it that," only took on significance before the jury when the prosecutor, in his closing argument, attempted to equate it with the attack upon the elderly female victim in this case.

court-appointed expert who had examined defendant in connection with the 1972 Maruyama burglary. In the report, Dr. Meyers opined that defendant lacked the mental capacity to form the specific intent to rob, that he was intellectually "subnormal," "gravely disabled," had "disturbed perceptive abilities," and that "his reality contact is not good." In addition, Dr. Meyers concluded defendant "cannot really differentiate the masculine and feminine roles." Defendant's investigator testified Dr. Meyers himself was elderly and was unable to testify because he had recently fallen seriously ill. The prosecutor objected to admission of the report, arguing that Dr. Meyers had not been a witness at the prior proceeding, that consequently the People never had an opportunity to cross-examine him, and that the report was inadmissible hearsay. The trial court agreed and excluded the report.

■ Defendant contends the trial court deprived him of due process of law by excluding Dr. Meyers's report. Conceding the report was hearsay, he contends it was nevertheless admissible under *Green* v. *Georgia* (1979) 442 U.S. 95 [60 L.Ed.2d 738, 99 S.Ct. 2150].

In *Green* v. *Georgia*, a capital defendant sought to introduce prosecution testimony from his codefendant's separate trial in order to establish that the codefendant, and not Green, alone had murdered the victim. The prosecutor successfully objected on hearsay grounds. Green was convicted and sentenced to death. (442 U.S. at p. 96 [60 L.Ed.2d at p. 740].) The high court concluded that: "Regardless of whether the proffered testimony comes within Georgia's hearsay rule, *under the facts of this case* its exclusion constituted a violation of the Due Process Clause of the Fourteenth Amendment. The excluded testimony was *highly relevant* to a critical issue in the punishment phase . . . and *substantial reasons* existed to assume its reliability . . . . *In these unique circumstances,* 'the hearsay rule may not be applied mechanistically to defeat the ends of justice.' [Citation.]" (*Id.* at p. 97 [60 L.Ed.2d at p. 741], italics added.)

We find *Green* v. *Georgia* inapposite on these facts. Here there were no "substantial reasons" to assume the reliability of Dr. Meyers's report; it was 10 years old, Meyers had not been a witness and was thus never cross-examined at the prior proceeeding, and due to his illness he was no longer available to be cross-examined by the People in these proceedings to test the accuracy and validity of the conclusions drawn in his earlier report. Moreover, much of Dr. Meyers's report was cumulative to the findings of Van Vorast and Dr. Maloney, who testified defendant was of low intelligence, would need "continual intensive supervision," exhibited deficiencies in certain "perception areas, perceptual motor areas," and may have suffered from organic brain damage. The only arguably distinctive finding of Dr. Meyers not duplicated in the findings of the other experts was defendant's

possible inability to differentiate masculine and feminine roles. But given the age of the report, and the circumstances which foreclosed any opportunity for the People to impeach or otherwise test the validity of the conclusions drawn therein, we conclude it was properly excluded.

### 8. *Exclusion of Statistical Information*

 Defense counsel sought to introduce statistical evidence reflecting the number of special circumstance cases in which the death penalty was imposed, in relation to all such cases filed since the enactment of the 1977 death penalty law. The trial court ruled the proffered testimony irrelevant and inadmissible. Defendant contends it was relevant mitigating evidence under the Eighth Amendment, and that its exclusion requires reversal of the penalty verdict.

Evidence relating to the incidence of death judgments since the enactment of the 1977 death penalty law is not relevant to any issue material to the choice of penalty under the Eighth Amendment. Such evidence has "no bearing on the character or record of the individual offender or the circumstances of his particular offense, which are the proper focus of a penalty trial under *Woodson* v. *North Carolina* (1976) 428 U.S. 280, 304 . . . . Unlike mitigating evidence of a defendant's background and character, which may be introduced to elicit the sympathy or pity of the jury, [information about the punishment of assertedly 'similarly situated' persons] do[es] not aid the jury in making an *individualized* assessment of the crucial issue whether the death penalty is appropriate for the particular defendant on trial." (*People* v. *Grant* (1988) 45 Cal.3d 829, 860 [248 Cal.Rptr. 444 [755 P.2d 894], italics in original [speaking to the irrelevancy, under the Eighth Amendment, of evidence relating to the manner in which the death penalty is carried out].)

### 9. *Testimony Regarding Obscene Letters*

On cross-examination of defendant's mother, Mrs. Wilson, the prosecutor asked her whether she had had an argument with her son "about his mailing obscene letters to women in the neighborhood." She answered in the affirmative. Defense counsel objected, contending the question was beyond the scope of direct examination. The trial court overruled the objection.

 Defendant now contends the trial court erred by permitting the question and that the error requires reversal. We disagree. Wilson testified on direct examination that defendant "is probably one of the sweetest children—child—one of the sweetest kids I got," and that "[h]e was just such a

delightful fellow even right now." Manifestly, the prosecutor's question about the obscene letters was well within the scope of Wilson's testimony on direct examination. The challenged testimony was plainly admissible on rebuttal. (Evid. Code, § 210; *People* v. *Rodriguez, supra*, 42 Cal.3d at pp. 791-792.)

### 10. *Evidence of Violent Criminal Conduct Underlying Defendant's Prior Felony Convictions*

Defendant argues that the trial court erred in admitting evidence of other criminal conduct which went beyond the "least adjudicated elements" of his prior convictions. Specifically, he contends that although he was previously convicted of burglary in the Maruyama incident, Agent Cauchon's testimony tended to show he had also assaulted and robbed that victim. Similarly, Officer Tuosto's testimony about the robbery of Tracie George, in which he related that a firing pin indentation was found on the chambered cartridge in defendant's gun, could have supported an inference that defendant had pulled the trigger but the gun had misfired. The prosecutor later argued that this evidence demonstrated defendant's willingness to use the gun, hence lending further support to an inference of his dangerousness.

We have previously rejected this argument. (See *People* v. *Melton* (1988) 44 Cal.3d 713 [244 Cal.Rptr. 867, 750 P.2d 741].) A prior felony conviction that involves a crime of violence can be considered under both factors (b) and (c) of section 190.3; the only limitation is that "an individual criminal act cannot be counted twice in aggravation *for the same purpose.*" (44 Cal.3d at pp. 764-765, italics in original.) The purpose of factor (b) is to show the defendant's propensity for violence; the purpose of factor (c) is to show the capital offense is the culmination of the defendant's habitual criminality—that it was undeterred by the community's previous criminal sanctions. (*Melton, supra*, 44 Cal.3d at p. 764; *People* v. *Malone, supra*, 47 Cal.3d at p. 46; *People* v. *Balderas* (1985) 41 Cal.3d 144, 202 [222 Cal.Rptr. 184, 711 P.2d 480].)

Defendant's felony convictions for the Maruyama burglary and the Tracie George robbery were admissible under section 190.3, factor (c). The evidence that he assaulted and robbed Maruyama during the burglary, and may have attempted to fire his weapon during the Tracie George robbery, was separately admissible under factor (b). (*Melton, supra*, 44 Cal.3d at p. 764.)

### 11. *Agent Cauchon's Testimony*

Agent Cauchon was involved in defendant's apprehension and prosecution for the 1972 Maruyama burglary. Defendant makes several arguments

attacking the admissibility of Cauchon's testimony. Cauchon related that Thomas, defendant's juvenile accomplice, told him that he (Thomas) had to constantly remind defendant not to harm Mrs. Maruyama during the burglary.

Defendant first claims the statements by Thomas were inadmissible hearsay, and that if the failure to object waived the claim on appeal, such omission constituted ineffective assistance of counsel. Although defense counsel failed to register a hearsay objection to this testimony, any such objection would have been futile. The statement that defendant had to be reminded not to harm the victim was only elicited by the prosecutor on redirect examination *after* Agent Cauchon related on cross-examination that Thomas said defendant at one point had tried to comfort the victim. Since defense counsel elicited part of Thomas's conversation to Cauchon on cross-examination, the prosecutor was entitled to inquire into the remainder of the conversation; hence a hearsay objection would not have been sustainable. (Evid. Code, § 356; *People v. Williams* (1975) 13 Cal.3d 559, 564-565 [119 Cal.Rptr. 210, 531 P.2d 778].)

Defendant next claims Cauchon's testimony was improperly admitted over defendant's (nonhearsay) objection because it was contrary to a stipulation detailing the facts surrounding the Maruyama burglary. The only aspect in which Cauchon's testimony differed from the stipulation was his recounting that defendant had stated it was he who had held the victim—whereas the stipulation stated, "The big man [presumably defendant, who is over six feet tall and weighed two hundred and forty pounds] told the smaller man to put his hand over her mouth and the smaller man did so." As the People point out, however, the stipulation was meant to cover what *victim Maruyama* would have testified to, not what Agent Cauchon might relate when called to the stand. Any factual discrepancies remained probative and were matters properly left for the jury's resolution. (*People v. Karis* (1988) 46 Cal.3d 612, 639 [250 Cal.Rptr. 659, 758 P.2d 1189].)

Finally, defendant submits Cauchon's statement that defendant felt no remorse over the Maruyama burglary was inadmissible because it was irrelevant, did not fall within a statutory aggravating factor, and infringed on his Fifth Amendment right against compelled self-incrimination. Defense counsel, however, objected solely on grounds of relevancy and lack of foundation. ■ Although it is clear that the People may not present evidence in aggravation unless it is relevant to a statutory aggravating circumstance (*People v. Boyd, supra,* 38 Cal.3d at pp. 771-776), we have held, under a prior death penalty law, that the presence or absence of remorse is a factor relevant to the jury's penalty determination (*People v. Coleman* (1969) 71 Cal.2d 1159, 1168 [80 Cal.Rptr. 920, 459 P.2d 248]), and we have

since observed that the concept of remorse for past offenses as a mitigating factor sometimes warranting less severe punishment or condemnation is universal. (*People* v. *Ghent, supra,* 43 Cal.3d at p. 771.)

12. *Photographs of the Victim*

Defendant maintains that the trial court abused its discretion by admitting three "gruesome" photographs of the victim over defense objection. The prosecutor noted that certain graphic autopsy photographs were not being offered into evidence, but that the photographs challenged here, which depicted the victim's body exactly as it was found by the police, were relevant to show the extent of the victim's injuries and the amount of force used in the commission of the murder.

■ "It is well settled that the admission of photographs of the victim lies within the discretion of the trial court and that exercise of discretion will not be disturbed unless the probative value of such photographs is clearly outweighed by their prejudicial effect. [Citations.]" (*People* v. *Thompson* (1988) 45 Cal.3d 86, 114-115 [246 Cal.Rptr. 245, 753 P.2d 37].)

We have examined the photographs complained of and conclude they were not unduly "gruesome" and were further relevant to "indicat[e] the manner in which the crime had been committed. [Citations.]" (*Thompson, supra,* 45 Cal.3d at p. 115.)

13. *Claims of Prosecutorial Misconduct*

Defendant asserts that the prosecutor committed various instances of misconduct at the penalty phase. As will be shown, none of these claims warrants reversal of the penalty verdict.

a. *Comparison of Defendant to His Sister*

During his closing argument, the prosecutor alluded to the evidence of defendant's childhood years, and argued: "Of course, she [defendant's mother] did testify that his older sister received exactly the same type of treatment and she's never had any trouble whatsoever with the law, didn't go out and murder people, rob people, rape people, injure people." ■ Defendant now contends this argument was improper in light of the trial court's exclusion of Mrs. Wilson's "opinion testimony" concerning how defendant came to find himself in the position he is in. (See Discussion, *ante,* at pp. 424-425.)

Since there was no objection to this line of argument, defendant is precluded from raising the claim of prosecutorial misconduct on appeal. (*People* v. *Green, supra,* 27 Cal.3d at p. 34.) Nor would defendant's reliance on *Skipper* v. *South Carolina* (1986) 476 U.S. 1 [90 L.Ed.2d 1, 106 S.Ct. 1669] be availing even had an objection been lodged. In *Skipper,* the trial court had excluded a capital defendant's proffered evidence that he was well behaved during his pretrial custody in county jail, while allowing the prosecutor to argue in closing that the defendant would pose a danger to others if returned to prison. The high court concluded this violated defendant's Eighth Amendment right to present mitigating evidence to rebut the prosecution's evidence of future dangerousness, and that, moreover, "elemental due process" would not permit a death sentence to be based on evidence which the defendant did not have a chance to deny or explain. (*Skipper, supra,* 476 U.S. at p. 5, fn. 1 [90 L.Ed.2d at p. 7].)

As already noted, here Mrs. Wilson did testify at some length regarding defendant's arduous childhood and upbringing. Indeed, it was defense counsel who, in questioning Mrs. Wilson on direct examination, elicited the information that defendant's sister was stable, employed, and never had any trouble with the law. (See Discussion, *ante,* at p. 424.) And although the prosecutor's reference to defendant's sister during closing argument seemingly implied that defendant's aberrant behavior was not attributable to his upbringing, defendant presented evidence of impaired psychological functioning and low intelligence which, counsel argued, accounted for their differing personalities. Moreover, the jury was repeatedly admonished that counsel's arguments were not evidence in the case.

b. *Personal Characteristics of the Victim*

Defendant assigns as misconduct the prosecutor's closing argument describing the personal characteristics of the victim. Specifically, the prosecutor argued: "What was Patricia Hunter's crime? The poor 76-year-old victim in this case. [¶] She lived alone. She was a widow. She went to work regularly. She taught Sunday school there. [¶] Her crime was that she was old. She was weak and she was defenseless against the defendant. That was her crime."

Defendant's reliance on *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529] is unavailing on these facts. *Booth* involved the introduction into *evidence* of lengthy and specific details regarding the actual impact of the crimes on the victim's *family.* (*People* v. *Ghent, supra,* 43 Cal.3d at p. 772.) The holding in that case is patently distinguishable from the prosecutorial argument challenged here which, insofar as it characterized the 76-year-old victim of these crimes as "weak" and "defenseless,"

was fair comment on the circumstances of the crimes. (§ 190.3, factor (a); *People* v. *Carrera* (1989) 49 Cal.3d 291, 336-337 [261 Cal.Rptr. 348, 777 P.2d 121] ["*Booth* does not purport to bar generally the use of information about a murder victim at the penalty phase."]; see also *South Carolina* v. *Gathers* (1989) 490 U.S. 805, 810-811 [104 L.Ed.2d 876, 882-883 109 S.Ct. 2207, 2210-2211].)[24]

### c. *Comment on How Defense Counsel Would Feel If Incarcerated With Defendant*

Defendant argues the prosecutor "improperly injected the person and personality of defense counsel into the penalty phase determination process" by referring to defense counsel to make the point that defendant would be a danger in prison. After reiterating defense counsel's position that defendant's numerous threats were merely a cathartic device and that he would not really be a violent prisoner, the prosecutor commented: "I wonder if . . . [defense counsel] would feel so secure if . . . [he] had to be a prisoner that was in custody with the defendant and the defendant had some real or imaginary grievance with him." Once again, however, the failure to object precludes raising the claim of misconduct on appeal. (*People* v. *Green, supra,* 27 Cal.3d at p. 34.) Nor could this "hypothetical" have prejudiced defendant in light of the record in this case.

### d. *Argument That Defendant Showed No Remorse*

During closing argument, the prosecutor asked the jury: "What do we know from listening to the tape [of defendant's confession]? One thing we know is that the defendant has no remorse whatsoever about this. [¶] Did you hear any remorse in that tape? Did you hear any—" Defense counsel interposed an objection that was overruled.

As previously indicated (see Discussion, *ante,* at pp. 433-434), such comments on defendant's lack of remorse were wholly proper and not misconduct. (*People* v. *Ghent, supra,* 43 Cal.3d at p. 771; *People* v. *Coleman, supra,* 71 Cal.2d at p. 1168.)

---

[24] Defense counsel himself later argued to the jury: "One life is gone and [it's] been—was a terrible crime. I am first to acknowledge Mrs. Hunter deserved to end her life peacefully rather than the way she did."

14. *Alleged Instructional Errors*

a. *Robertson Error*

 Defendant correctly asserts that the trial court erred in failing to instruct the jury sua sponte that it could not consider the other-crimes evidence unless the commission of such crimes had been proven beyond a reasonable doubt. (*People* v. *Robertson, supra*, 33 Cal.3d 21 [1977 death penalty law]; see *People* v. *Gates* (1987) 43 Cal.3d 1168, 1202 [240 Cal.Rptr. 666, 743 P.2d 301] [1978 death penalty law].) In particular, he argues that the failure to give the "reasonable doubt" instruction permitted the jury to improperly consider three different incidents: (1) the false imprisonment and robbery related to the Maruyama burglary; (2) the "possible" assault on the prison classification committee members, including Nyberg (where defendant threw the chair); and (3) the "possible" battery on San Quentin Prison kitchen worker Teri Gelatini.

Although this court's opinion in *Robertson* was filed three months *after* defendant's trial, prior to *Robertson* a long line of cases had established that during the penalty phase the jury must be instructed that it "may consider evidence of other crimes only when the commission of such other crimes is proved beyond a reasonable doubt." (*People* v. *Stanworth* (1969) 71 Cal.2d 820, 840 [80 Cal.Rptr. 49, 457 P.2d 889]; see *People* v. *Miranda* (1987) 44 Cal.3d 57, 97 [241 Cal.Rptr. 594, 744 P.2d 1127], and cases cited.)

However, we conclude here, as we did in *People* v. *Morales, supra*, 48 Cal.3d at pages 566-567, *People* v. *Miranda, supra*, 44 Cal.3d at page 98, and *People* v. *Gates, supra*, 43 Cal.3d at page 1202, that the failure to give a *Robertson* reasonable doubt instruction could not have affected the jury's consideration of the challenged other-crimes evidence.

The *Robertson* instruction need not be given where defendant already has been convicted of the prior offense. (*Morales, supra*, 48 Cal.3d at p. 566; *Gates, supra*, 43 Cal.3d at p. 1202.) Defendant correctly points out, however, that the evidence respecting the Maruyama burglary extended beyond the mere fact of his conviction of burglary, and included evidence regarding his false imprisonment and robbery of the elderly victim. As noted in *Gates, supra*, 43 Cal.3d at page 1202, footnote 13, a *Robertson* instruction should be given where the penalty phase evidence discloses a crime in addition to the crime of which the defendant was convicted. (See *Morales, supra*, 48 Cal.3d at p. 566.)

But here, the defense *stipulated* to the facts of the Maruyama burglary, which stipulation plainly encompassed those facts supportive of a finding

that 80-year-old Shui Maruyama had been falsely imprisoned and robbed by defendant and his juvenile accomplice during the burglary. In fact, at one point during his closing argument, defense counsel referred to the Maruyama incident and told the jury: "[Defendant] had no business being there, and he's completely guilty of that crime. Don't misunderstand me." Prejudicial error due to the failure to give a reasonable doubt instruction cannot be predicated on a record such as this one.

The evidence of the remaining two incidents for which, defendant argues, the *Robertson* instruction was required, can at best be characterized as de minimis. The evidence showed that defendant did not throw the chair at anyone in particular, nor did that incident result in harm to anyone, and it is doubtful the jury placed much weight on evidence that defendant allegedly threw some paper at San Quentin Prison kitchen worker Teri Gelatini. In any case, as in our conclusion regarding the "lack of notice" argument pertaining to the nonstatutory aggravating evidence, we have already determined that such evidence was improperly admitted under *Boyd* (*supra*, 38 Cal.3d 762), but we have concluded on this record that its erroneous admission could not in reasonable possibility have prejudiced the penalty verdict. (*Ante*, at p. 429; *People* v. *Brown*, *supra*, 46 Cal.3d at p. 448.) It follows that the failure to give a *Robertson* instruction sua sponte, pertaining to the same evidence, was likewise nonprejudicial.

Lastly, we have also considered the effect the failure to give the *Robertson* instruction may have had on the evidence concerning the prior robberies of victims Jennifer Salsbury, Muriel Cunningham, and Stephen Hardin. All of those witnesses testified at this trial concerning the circumstances of their robberies at defendant's hands, all unwaveringly identified defendant as the person who had robbed them at gunpoint, and all had positively identified him in open court within days after their respective robberies—in each incident defendant having perpetrated the robbery alone. We conclude that prejudicial error due to the failure to give the reasonable doubt instruction cannot be predicated on introduction of the evidence of those prior violent incidents.

b. *Brown Error*

Defendant contends that the court's penalty phase instructions, in conjunction with the prosecutor's closing argument, misled the jury regarding the scope of its sentencing responsibility and discretion.

The trial court instructed the jury on its sentencing responsibility in accordance with section 190.3 (former CALJIC No. 8.84.2).[25] In *People v. Brown* (1985) 40 Cal.3d 512, 540-544 [220 Cal Rptr. 637, 709 P.2d 440], reversed on other grounds *sub nom. California v. Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837], we recognized that this instruction, when given in isolation, had the potential to mislead the jury regarding the fundamental scope of its sentencing discretion. "Our concerns were twofold and interrelated: that a juror might understand his function as (i) merely the 'counting' of factors and then (ii) reaching an 'automatic' decision, with no exercise of personal responsibility for deciding, by his own standards, which penalty was appropriate. [Citation.]" (*People v. Milner* (1988) 45 Cal.3d 227, 256 [246 Cal.Rptr. 713, 753 P.2d 669]; see *People v. Allen* (1986) 42 Cal.3d 1222, 1277 [232 Cal.Rptr. 849, 729 P.2d 115].)

In cases decided before *Brown*—such as the instant case—we examine the entire record "to determine whether, in context, the sentencer may have been misled to defendant's prejudice about the scope of its sentencing discretion . . . ." (*Brown, supra,* 40 Cal.3d at p. 544, fn. 17.)

We are satisfied on this record that the jury was not misled or confused regarding its responsibility to *weigh*, rather than count, the applicable statutory factors. Significantly, pursuant to defense counsel's request, the trial court also gave the following instruction: "In weighing the aggravating and mitigating factors, you are not to merely count numbers on either side. You are instructed, rather, to weigh and consider the factors." Furthermore, in response to a jury inquiry during deliberations concerning the role of mercy in their deliberations, the trial court told the jury that it "may use its own individual moral judgment in determining the facts *and assigning weight to them*." (Italics added.)

In his closing argument, the prosecutor told the jury that defense counsel "wants to use the example of the scales of justice with the scales weighing back and forth. And basically, that is what we have here, we have the weighing process." He then told the jurors to "weigh this evidence in your mind."

---

[25] The jury was instructed: "It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on defendant. [¶] After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without possibility of parole."

In similar fashion, defense counsel told the jury: "Each factor in mitigation or aggravation has to be weighed in determining whether this man is going to live or die and your individual subjective opinion is necessary for a proper weighing of the evidence. [¶] What does that mean? [¶] It means simply that you are not going into that jury room to be bookkeepers and total up how many things there are and draw a line and say we have more things here in aggravating than in the mitigating column. [¶] You don't need juries for that."

We further conclude that on this record there can be no doubt but that the jury fully understood the nature of its normative sentencing responsibilities and discretion. It is true that, in one instance, the prosecutor argued: "[If] you find the aggravating evidence outweighs the mitigating evidence, you shall, not 'you may' but you shall impose the death penalty." But we have repeatedly held that it is not improper per se to instruct the jury that it "shall" impose death. (See, e.g., *People v. Allison* (1989) 48 Cal.3d 879, 905 [258 Cal.Rptr. 208, 771 P.2d 1294]; *People v. Grant, supra,* 45 Cal.3d 829, 857; *People v. Hendricks* (1988) 44 Cal.3d 635, 653 [244 Cal.Rptr. 181, 749 P.2d 836]; *People v. Allen, supra,* 42 Cal.3d at p. 1279 & fn. 38.)

Once again, in response to a jury inquiry about the role "mercy" played in their deliberations, the court told the jury that it "may use its own individual moral judgment in determining the facts and assigning weight to them." Defense counsel emphasized for the jury that, "We need juries to use their brains and common sense and everything else at their disposal. [¶] The jury has absolute discretion in the weight to be given these factors, and even one of these factors in mitigation, we feel it is of enough weight it can outweigh all the factors in aggravation even though they may total up 10 to 1. [¶] I'm not saying that they do. [¶] But this is not a bookkeeping process. That's all I want to emphasize to you." Toward the conclusion of his argument, counsel again reminded the jury, "And remember the mitigating includes fairness and mercy." Finally, toward the conclusion of his argument counsel stated, ". . . your individual subjective opinion is necessary for a *proper weighing of the evidence,*" and, "I just want to emphasize one other thing to you which I have said before. You can't pass the buck and say everybody wanted the death penalty so you had to go along. There is no way you can live with yourselves and do that."

Viewing the instructions and arguments as a whole, we are satisfied the jurors were not misled as to their sentencing discretion and realized the ultimate sentencing responsibility rested with them, and them alone. (*People v. Allison, supra,* 48 Cal.3d 879, 906; *People v. Hendricks, supra,* 44 Cal.3d at p. 655.)

c. *Factor (k)*

██ Defendant also contends the penalty phase instructions precluded the jury from giving independent weight to his mitigating evidence.

The jury in this case did receive instruction in the unadorned, literal terms of section 190.3, factor (k). In *People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813], we found factor (k) (former CALJIC No. 8.84.1) "potentially confusing" in that it spoke only of a "circumstance which extenuates the gravity of the crime." We therefore imposed the prospective requirement that "trial courts—in instructing on the factor embodied in section 190.3, [factor] (k)—should inform the jury that it may consider as a mitigating factor 'any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime' and any other 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.' " (*Easley, supra,* 34 Cal.3d at p. 878, fn. 10.)

Our review of the arguments and instructions as a whole reinforces our conclusion that the jury understood its obligation to consider and weigh all of defendant's mitigating evidence. Here, as in *People* v. *Allen, supra,* 42 Cal.3d at page 1276, "the jury was presented with 'sympathy' evidence in the penalty phase . . . [and] the prosecutor said nothing to suggest the jury should not consider such evidence; on the contrary, the thesis of his argument was that it was quite proper for the jury to consider such evidence." The prosecutor below expressly told the jury that defendant's four witnesses—his mother, uncle, and the two experts (Drs. Van Vorast and Maloney)—presented testimony which was relevant and admissible under section 190.3, factor (k). Defense counsel likewise characterized factor (k) as "the catch-all category," explaining that it covered " 'any other factors in mitigation.' "

d. *Failure to Instruct on Mercy*

██,██ Defendant unsuccessfully requested the trial court to give the following special instruction: "In this part of the trial, the law does not forbid you from being influenced by pity for the defendant. However, the law does forbid you from being governed by mere conjecture, prejudice, passion or public opinion." After the jury began deliberating, they sent the judge a note containing a single question: "Can mercy be considered by the jury as a mitigating circumstance?" The trial court held a hearing at which defense counsel urged the judge to answer the note in the affirmative. The prosecutor took the opposite position. Instead of giving a simple yes-or-no answer, the judge gave the jury this reply: "The circumstances in aggrava-

tion and in mitigation are contained in the jury instructions. The jury may use its own individual moral judgment in determining the facts and assigning weight to them." Very shortly thereafter, the jury returned their penalty verdict.

Defendant asserts that the trial court's failure to affirmatively instruct the jury to consider mercy requires reversal of the penalty verdict. This is the "flip side" of the so-called no-sympathy instruction at issue in *People* v. *Brown, supra,* 40 Cal.3d 512. In *Brown,* the jury was instructed it "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." The United States Supreme Court held that the giving of this standard California antisympathy instruction did not violate the federal Constitution. (*California* v. *Brown, supra,* 479 U.S. at p. 542 [93 L.Ed.2d at p. 940, 107 S.Ct. at p. 840].) Whereas in *Brown* the jury was instructed *not* to be swayed by "mere sympathy," here defendant sought to have the jury affirmatively instructed that they *could* be influenced by pity for the defendant, so long as it was not "mere conjecture, prejudice, passion or public opinion."

However, the jury here had already been instructed to consider "[a]ny other circumstance which extentuates the gravity of the crime even though it is not a legal excuse for the crime," and the arguments of counsel made clear that the jury was to consider the mitigating evidence presented by the defense. (See Discussion, *ante,* at p. 441.) We fail to perceive any basis upon which to conclude that the court's refusal to give the proffered defense instruction was error.

The propriety of the trial court's response to the jury's inquiry about whether "mercy" was a "mitigating circumstance" is a separate matter. "Sympathy is not itself a mitigating 'factor' or 'circumstance.' Recognition that a jury's exercise of sentencing discretion in a capital case may be influenced by a sympathetic response to mitigating evidence is entirely consistent with that observation. The jury is permitted to consider mitigating evidence relating to the defendant's character and background precisely because that evidence may arouse 'sympathy' or 'compassion' for the defendant." (*People* v. *Lanphear* (1984) 36 Cal.3d 163, 166 [203 Cal.Rptr. 122, 680 P.2d 1081] [1977 death penalty law].)

Inasmuch as the jury's inquiry seemed directed at *how* they should consider the evidence, the trial judge properly reemphasized that the jurors were to use their own moral judgment in weighing the facts presented at the penalty phase. While the trial court perhaps could have been more explicit in instructing the jury that mercy was a permissible response to defendant's mitigating evidence, the trial court's reply was adequate and not misleading.

Counsel's closing argument echoed these same concerns. He told the jury: "I want to tell you . . . what the definition of mitigation is in the legal sense, the legal [definition] of Black's Law Dictionary. [¶] 'Mitigation is not a justification or excuse of the offense in question but it is a matter which in fairness and mercy'—and I underline the word 'mercy'—'that as part of the legal definition of the mitigation may be considered extentuating or reducing the degree of moral culpability.'" A few moments later, counsel implored the jurors thusly: "I also ask that you be merciful. This is certainly a case where it is proper to ask for mercy and not just an emotional appeal, not in this case—in one case and ask you to be merciful." Counsel returned to this theme when he later argued, "And remember the mitigating includes fairness and mercy."

Significantly, the prosecutor never contradicted defense counsel's argument that "mercy" was a proper consideration. He did at one point call for the jury to make their decision, "not on an emotional basis but on a cool, clear, logical basis." Later, he argued that "those kinds of emotional types of argument are not the types of things that you should be basing your decision on, strictly the facts and the law as [the trial court] instructs you." We view these statements as cautionary remarks to the jury not to base their verdict on "untethered" sympathy—i.e., sympathy or conjecture wholly unrelated to the statutory mitigating factors in this case.

### e. *"Extreme" Mental or Emotional Disturbance*

Pursuant to the statutory language of section 190.3, factor (d), the jury was instructed to consider as a mitigating circumstance, "[w]hether or not the offense was committed while the Defendant was under the influence of *extreme* mental or emotional disturbance." (Italics added.) Defendant theorizes that this instruction informed the jury the mitigating evidence of emotional disturbance he presented at the penalty phase could only be considered if it was "extreme."

We rejected the identical claim in *Ghent, supra,* 43 Cal.3d at page 776, under the 1977 death penalty law. Under that law, the "extreme mental or emotional disturbance" provision in former section 190.3, factor (c) was worded identically to the present provision in section 190.3, factor (d). The defendant in *Ghent* argued that former factor (c), "by requiring an 'extreme' condition, unduly limited the kinds of mitigating evidence admissible at the penalty phase." Citing *Lockett v. Ohio* (1978) 438 U.S. 586, 608 [57 L.Ed.2d 973, 992, 98 S.Ct. 2954], the defendant urged that "the trier of fact in a capital case must be permitted to give independent mitigating weight to any aspect of a defendant's character or background which is relevant to the penalty issue. [Citation.]" We rejected Ghent's claim that reversal was

required, concluding that the "catchall" provision in former section 190.3, factor (j) (now factor (k)) "is sufficient to permit the penalty jury to take into account a mental condition of the defendant which, though perhaps not deemed 'extreme,' nonetheless mitigates the seriousness of the offense." (*Ghent, supra,* 43 Cal.3d at p. 776; see also *People* v. *Morales, supra,* 48 Cal.3d at pp. 567-568 [rejecting the claim under the 1978 death penalty law].)

Although in *Ghent* we saw no basis in the record for concluding the jury failed to give proper weight to the evidence of defendant's mental and emotional difficulties even though they may not have been viewed as "extreme," defendant's case is somewhat closer. When discussing the applicability of factor (d), the prosecutor urged that there was no evidence defendant was "psychotic, delusional, paranoid, schizophrenic, or that he hallucinated." Although this was proper argument since factor (d) concerns *extreme* emotional problems, thereafter, when discussing the applicability of factor (k) to the evidence, the prosecutor returned to this line of argument. After reviewing the testimony of Drs. Van Vorast and Maloney, he suggested that the questions to be asked are: "Was the defendant psychotic; did he have delusions; did he have hallucinations; did he know what he was doing? *Those are some legitimate excuses or mitigating circumstances.*" (Italics added.)

Although this latter argument carried some potential for confusing the jury into believing that defendant's evidence of emotional disturbance was not a "legitimate" mitigating circumstance—even under factor (k)—unless it was extreme, defense counsel's astute closing argument negated any possibility of prejudice. Counsel explained to the jury that, "even if his mental or emotional disturbance may not be classified as extreme, that by no means [requires] that it should be thrown out as a factor. It's only if it's extreme—it's put in a separate category, but when you get down to the last category which is the so-called catchall category, any other circumstances which extenuates the gravamen [*sic*] of the crime even though it is not a legal excuse for the crime, which the district attorney correctly states—which is the one that encompasses most of the mitigating evidence. [¶] You simply are to consider mental or emotional disturbance that should not be extreme under that category, and you can give it the weight that you feel it is entitled to . . . ."

We therefore conclude the jury was properly instructed in this regard. (*People* v. *Morales, supra,* 48 Cal.3d at p. 568.)

### f. *Circumstances of the Crimes as an Aggravating Factor*

The jury was instructed in the statutory language of section 190.3, to wit: "In determining which penalty is to be imposed on defendant, you shall

consider all of the evidence which has been received during any part of the trial in this case. You shall consider, take into account and be guided by the following factors, if applicable: [¶] (a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true . . . ."

Defendant contends that the failure to offer further guidance to the jury—as to what types of "circumstances of the crime" were aggravating—permitted the jury to vote to impose death based on constitutionally irrelevant factors such as whether the crime was particularly bloody or gruesome.[26]

We addressed this issue under the 1977 death penalty law in *People* v. *Phillips, supra*, 41 Cal.3d 29. In that case, the defendant claimed "the trial court had a sua sponte duty to give the instruction on 'the nature and circumstances of the present offense' a clarifying gloss to inform the jury that its penalty determination must not be based on facts that are 'common to all homicides.' " (*Id.* at p. 63.) We concluded that defendant's argument revealed a "basic misunderstanding" of the statutory scheme since, in order to perform its moral evaluation of whether death was the appropriate penalty, the facts of the murder "cannot comprehensibly be withdrawn from the jury's consideration . . . ." (*Id.* at p. 64.)

Defendant does not attempt to distinguish *Phillips, supra*, 41 Cal.3d 29, but instead relies on a single footnoted passage in *Godfrey* v. *Georgia* (1979) 446 U.S. 420 [64 L.Ed.2d 398, 100 S.Ct. 1759]. In *Godfrey*, the high court examined the Georgia statutory scheme which permitted imposition of the death penalty for a murderer whose crime was found to be " 'outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim.' " (*Id.* at p. 422 [64 L.Ed.2d at p. 403].) The court reversed the defendant's death sentence since he killed his victims instantly with blasts from a shotgun and thus could not be said to have tortured or committed battery on his victims. The court observed: "In light of this fact, it is constitutionally irrelevant that the petitioner used a shotgun instead of a rifle as the murder weapon, resulting in a gruesome spectacle in his mother-in-law's trailer. An interpretation of . . . [the Georgia statutory scheme] so as to include all murders resulting in gruesome scenes would be totally irrational." (*Id.* at p. 433, fn. 16 [64 L.Ed.2d at p. 409].)

---

[26] Defendant requested the following instruction, which was refused: "You are instructed that the death penalty should be reserved for only the most aggravated crimes, crimes that are so shocking or repugnant that the murder stands out above the norm of first degree murders, or the background of the defendant set apart from the usual murderer." Defendant does not separately contend that the court erred in refusing this instruction.

We find the concerns set forth in *Godfrey* inapposite to California's death penalty law. The statutory scheme embodied in section 190.3 does not encompass all murders that are "gruesome," "bloody," or otherwise share any one particular fact pattern. Rather, the clear import of our statute (and the CALJIC instructions based thereon) is to require the jury to weigh a variety of enumerated factors toward determining whether death is the appropriate penalty in each individual capital prosecution. As we stated in *People* v. *Jackson, supra*, 28 Cal.3d 264, 316, in construing the nearly identical statutory factors of the 1977 law, "the factors involved . . . properly require the jury to concentrate upon the circumstances surrounding both the offense and the offender, rather than upon extraneous factors having no rational bearing on the appropriateness of the penalty. We believe that the aggravating or mitigating nature of these various factors should be self-evident to any reasonable person within the context of each particular case."

It follows that the trial court did not err in failing to further characterize or elaborate upon the nature of "circumstances of the crime" under section 190.3, factor (a).

### g. *Deletion of Nonapplicable Statutory Factors*

Defendant argues that the trial court erred in failing to delete the nonapplicable or irrelevant statutory factors from the instruction enumerating factors (a) through (k). (§ 190.3.) We have repeatedly rejected this claim: "as is apparent from the statutory language, it is for the jury to determine which of the listed factors are applicable or 'relevant' to the particular case. (§ 190.3, par. 6.)" (*People* v. *Miranda, supra*, 44 Cal.3d at p. 105; *People* v. *Allison, supra*, 48 Cal.3d at pp. 906-907.)

### h. *Failure to Instruct on Standard of Proof and Burden of Proof*

Defendant asserts that the 1978 death penalty statute is unconstitutional because it fails to require that aggravating factors be proved beyond a reasonable doubt. We have repeatedly rejected this claim, and do so again here. (See, e.g., *People* v. *Allison, supra*, 48 Cal.3d at p. 899.)

Defendant also asserts that the trial court had a sua sponte duty to instruct the jury that the People "bore the burden of proof" at the penalty phase. The argument misses the mark; the high court has held that "the constitutional prohibition on arbitrary and capricious capital sentencing determinations is not violated by a capital sentencing 'scheme that permits the jury to exercise unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member

of the class made eligible for that penalty by statute.' " (*California* v. *Ramos* (1983) 463 U.S. 992, 1008-1009, fn. 22 [77 L.Ed.2d 1171, 1185-1186, 103 S.Ct. 3446], quoting *Zant* v. *Stephens* (1983) 462 U.S. 862, 875 [77 L.Ed.2d 235, 248-2249, 103 S.Ct. 2733].) As we explained in *People* v. *Rodriguez, supra,* 42 Cal.3d at page 778, the 1978 death penalty law would not violate the Eighth Amendment "even if it set *no* standards for the sentencing of defendants already deemed death-eligible." (Italics in original, fn. omitted.)

"[T]he sentencing function [at the penalty phase] is inherently moral and normative, not factual; the sentencer's power and discretion under . . . [the 1978 law] is to decide the appropriate penalty for the particular offense and offender under all the relevant circumstances. [Citation.] . . . [¶] . . . Instructions like those discussed in *Brown*[, *supra,* 40 Cal.3d 512,] are better suited to the normative task of sentencing than are admonitions . . . which speak in terms associated with traditional factfinding." (*Rodriguez, supra,* 42 Cal.3d at p. 779.)

i. *Failure to Amend Guilt Phase Instruction That Defendant Was of "Sound Mind"*

At the guilt phase, the jury was instructed that, "You must assume that the defendant was of sound mind at the time of his alleged conduct which, it is charged, constitutes the crime described in the information." At the penalty phase, the trial court began its instructions with this statement: "Those instructions that you have already been given which pertain to the way in which you should approach your task as jurors, the way you should analyze the evidence, the way you should view witnesses and as to the voicing of your individual opinion as to the verdict all remain applicable to this phase of the case."

Defendant now argues reversal is required because the trial court failed to amend the introductory penalty phase instructions so as not to undercut the evidence he presented tending to show that he suffered from a diminished mental state. But the jury was expressly instructed to consider in making its penalty determination whether or not defendant was under the influence of extreme mental or emotional disturbance when he committed the offense, and both counsel's arguments reaffirmed that mental impairment could be considered in mitigation. Thus, a reasonable jury would not have understood the guilt phase instruction as establishing a conclusive presumption of soundness of mind at the penalty phase.

j. *"Overlapping" Special Circumstances*

Defendant maintains that the trial court erred in failing to instruct sua sponte that the robbery-murder and burglary-murder special circumstances

could only be considered as one special circumstance at the penalty phase because the two special circumstances arose out of an indivisible course of conduct. We have repeatedly rejected this claim (see, e.g., *People* v. *Melton, supra,* 44 Cal.3d at pp. 765-769) and find no occasion to reconsider the issue here.

### 15. *Automatic Motion to Modify Penalty Verdict*

"In every case in which the death penalty is returned, section 190.4, subdivision (e), requires the trial judge to 'review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances . . . and [to] make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reason for his findings.' " (*People* v. *Allison, supra,* 48 Cal.3d at p. 909.)

It is clear that the trial court satisfied the statutory requirements in this case. In declining to modify the verdict, the court made reference to "reweighing" the evidence, and stated the verdict would have been the same had the question of penalty been tried to the court alone. Moreover, the court concluded the aggravating outweighed the mitigating circumstances, and that the conclusion that death was appropriate was "inescapable" on this record. There was no error.

### 16. *Constitutionality of Death Penalty Law*

In a separate argument, defendant urges that the 1978 death penalty law violates the Eighth Amendment because it fails to replace arbitrary jury discretion with "objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death." (*Woodson* v. *North Carolina* (1976) 428 U.S. 280, 303 [49 L.Ed.2d 944, 960, 96 S.Ct. 2978].) We long ago rejected this claim (*Rodriguez, supra,* 42 Cal.3d at pp. 777-779); defendant presents no reasons for us to reconsider it here.

### 17. *Proportionality Review*

Defendant urges that we conduct intercase proportionality review, comparative sentence review, and disparate sentence review under section 1170, subdivision (f) as a matter of equal protection.

It is now settled that the Eighth Amendment requires no "intercase" proportionality review, statistical or otherwise (*Pulley* v. *Harris* (1984) 465 U.S. 37, 50-54 [79 L.Ed.2d 29, 40-43, 104 S.Ct. 871]), and we have repeat-

edly so recognized. (See, e.g., *People* v. *Walker, supra,* 47 Cal.3d at p. 651; *People* v. *Belmontes, supra,* 45 Cal.3d at p. 818.)

To the extent defendant is arguing that we should conduct "intracase" proportionality review—i.e., an examination of whether his death sentence is proportionate to his *individual* culpability, irrespective of the punishment imposed on others (see, e.g., *People* v. *Dillon* (1983) 34 Cal.3d 441, 477-482 [194 Cal.Rptr. 390, 668 P.2d 697]; *People* v. *Lynch* (1972) 8 Cal.3d 410, 423-424 [105 Cal.Rptr. 217, 503 P.2d 921])—he will not fare any better. Defendant has a long history of violent criminal conduct, having spent nine of the ten years preceding the instant offenses behind bars. In this episode he savagely beat, robbed, raped and murdered a defenseless 76-year-old woman while burglarizing her home. Nothing in the prior decisions of this court, or the federal courts, suggests that his punishment, as the actual killer, is constitutionally disproportionate to "the offense" or "the offender." (*People* v. *Melton, supra,* 44 Cal.3d at pp. 771-772.)

## CONCLUSION

We have found no prejudicial error at either the guilt or penalty phases of defendant's trial. The judgment is affirmed in its entirety.

Lucas, C. J., Panelli, J., Kennard, J., and Arabian, J., concurred.

**BROUSSARD, J.,** Concurring and Dissenting.—I concur in the majority opinion insofar as it affirms the judgment of guilt and the special circumstance findings, but I dissent from the opinion with respect to the penalty judgment. I would reverse the penalty judgment for the reasons expressed in part II of Justice Mosk's dissent.

**MOSK, J.**—I dissent.

When this case was originally before the court, we affirmed the judgment as to guilt but reversed it as to penalty for so-called "*Boyd* error" (*People* v. *Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782]), i.e., the introduction of aggravating evidence not relevant to any issue material to penalty under the 1978 death penalty law and, specifically, Penal Code section 190.3 (hereafter section 190.3). I joined the majority opinion authored by Justice Arguelles. After the court ordered a rehearing, I undertook to reconsider the question of guilt as well as that of penalty. Having done so, I conclude that the judgment should be reversed in its entirety. My reasons follow.

## I

During voir dire, the trial court—over defendant's objection—used an unauthorized procedure to select a jury to try his case, specifically, a novel version of the so-called "struck jury" method under which the parties were required to exercise their peremptory challenges against a panel containing more than the full complement of 12 prospective jurors.

By proceeding as it did in the selection of the jury, the trial court erred. The majority concede as much. Rightly so.

Former Penal Code section 1088 (hereafter former section 1088) applies to the case at bar. The provision stated as follows: "If all challenges on both sides are disallowed, either party, first the people and then the defendant, may take a peremptory challenge or pass unless the parties' peremptory challenges are exhausted; *and each party shall be entitled to have the panel full before exercising any peremptory challenge*. If all the parties on both sides pass consecutively, the jury shall then be sworn, unless the court, for good cause, shall otherwise order. The number of peremptory challenges remaining with a side shall not be diminished by any passing of a peremptory challenge." (Stats. 1953, ch. 1585, § 1, p. 3268, italics added.)

Given a reasonable reading, former section 1088 declared that "each party shall be entitled to have the panel full"—*and no more than full*—"before exercising any peremptory challenge." Otherwise, it could not have required that "If all the parties on both sides pass consecutively, *the jury shall then be sworn . . . .*"

It is manifest that the trial court acted in violation of former section 1088: it demanded that the parties exercise their peremptory challenges against a panel that was more than full.

The error requires reversal of the judgment in its entirety. As stated, former section 1088 gave defendant an entitlement to have the panel full, and no more than full, before exercising any peremptory challenge. The Legislature's evident intent in enacting the provision was to guarantee both fairness and the appearance of fairness. By proceeding as it did, the trial court improperly denied defendant's statutory entitlement and thereby withdrew the legislative guaranty.

Perhaps—as the majority seem to imply—a *minor* deviation from the procedures governing the exercise of peremptory challenges requires a showing of actual prejudice before reversal is ordered. (See *People* v. *Mitchell* (1964) 61 Cal.2d 353, 363-364 [38 Cal.Rptr. 726, 392 P.2d 526]

[prejudice required, but not found: the court allowed the People to exercise a peremptory challenge after they stated that they were satisfied with the panel of prospective jurors]; *People* v. *Hoyt* (1942) 20 Cal.2d 306, 318 [125 P.2d 29] [prejudice required, but not found: the court allowed a departure from the prescribed order for exercising peremptory challenges]; *People* v. *Saugstad* (1962) 203 Cal.App.2d 536, 547 [21 Cal.Rptr. 740] [same as *Mitchell*].)

But a *major* deviation—like that here—does not require such a showing. (See *People* v. *Scoggins* (1869) 37 Cal. 676, 677-681 [reversal without prejudice: the court demanded that the parties exercise their peremptory challenges against a panel containing less than the full complement of 12 prospective jurors].)

## II

At the penalty phase, the People presented a case for death that comprised the following elements: the nature and circumstances of the present offenses; defendant's prior felony convictions and the underlying conduct; and—over objection—defendant's behavior in prison, which, although bad, generally did not amount to a violation of a penal statute. Defendant presented a case for life that focused on his background and character—most prominently, the mental and emotional impairments he has suffered since childhood. Judged from the number of witnesses, and the extensiveness of the questioning on direct and cross-examination, the crucial issue bearing on the choice between life and death was the nature and significance of defendant's "bad acts" in prison. That the evidence relevant to this question was considered critical by the parties is manifest on the face of the record. That it was similarly viewed by the jury must be presumed.

By admitting in aggravation evidence of defendant's "bad acts" in prison, the trial court committed error under *People* v. *Boyd, supra,* 38 Cal.3d 762. The majority again concede as much.

It is plain that the "bad acts" evidence was not relevant to any issue material to penalty under the 1978 death penalty law and, specifically, section 190.3. To be sure, such issues include, in the words of that provision, "the presence or absence of other criminal activity by the defendant which involved the use or attempted use of force or violence or which involved the express or implied threat to use force or violence." But as the *Boyd* court held, "criminal activity" as used in section 190.3 means conduct—unlike the "bad acts" here—*that violates a penal statute.* (38 Cal.3d at p. 772.)

On this record, the *Boyd* error mandates reversal of the judgment of death.

In *People* v. *Brown* (1988) 46 Cal.3d 432 [250 Cal.Rptr. 604, 758 P.2d 1135], the court held that *Boyd* error is not automatically reversible, but is subject to harmless-error analysis under the so-called "reasonable possibility" test (*id.* at p. 449)—i.e., whether in its absence there is a reasonable possibility of an outcome more favorable to the defendant (see *id.* at pp. 446-448; see also *id.* at pp. 463-470 (conc. opn. of Mosk, J.)).

Such a possibility exists here. It is indeed true that the evidence supporting the appropriateness of death was substantial. The point is established by defendant's present offenses and his criminal history. But substantial too was the evidence supporting the appropriateness of life. As noted, since childhood defendant has suffered from mental and emotional impairments. The erroneously admitted evidence of defendant's "bad acts" in prison was of such character and force as to have affected the penalty determination. The evidence, it may perhaps be argued, would have weighed only lightly in favor of death. But it must have weighed—and heavily so—against life.

The majority conclude that there is not a reasonable possibility of a more favorable outcome. Their premise is that the evidence of defendant's "bad acts" in prison was "essentially cumulative" to other, properly admitted evidence. (Maj. opn., *ante*, at p. 429.) That premise, however, is unsupported. A review of the record demonstrates that neither the People nor defendant considered the evidence in question to be such. Rather, they both regarded it as distinctive in kind and substantial in weight. Presumably, the jury did so too. I find no reason to disagree.

## III

Accordingly, I would reverse the judgment in its entirety because of the erroneous jury-selection procedure. Further, I would reverse the judgment as to penalty, in and of itself, because of *Boyd* error.

Appellant's petition for a rehearing was denied February 20, 1991, and the opinion was modified to read as printed above. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.